STATE of Minnesota, Respondent,

v.

James Albert DeWALD, Appellant.

No. C3–90–43.

Supreme Court of Minnesota.

Nov. 30, 1990.

John M. Stuart, State Public Defender, Richard G. Carlson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

WAHL, Justice.

Defendant James Albert DeWald was convicted of two counts of murder in the first degree, in violation of Minn.Stat. § 609.185(3) (1988), for the death of Walter

Werdal who was killed by blows from a baseball bat during the burglary and robbery of Werdal's south Minneapolis home. Defendant appeals the conviction arguing that he is entitled to reversal or a new trial because of (1) prosecutorial misconduct, (2) ineffective assistance of counsel, (3) trial court error in failing to suppress evidence seized during execution of search warrants involving defendant, his apartment and his car, and (4) insufficiency of the evidence.[1] We affirm.

Walter Werdal lived across the alley from the home of John Carlson. At approximately 2:45 a.m. on November 4, 1988, Carlson was awakened by his dog. He looked out his back window and noticed that Walter Werdal's house was "all lit up" and that the back kitchen door was open. Carlson then saw a light go on in Werdal's attic. He saw two people in the attic, making lots of arm motions. The motions stopped and after several minutes, "all of a sudden" Werdal's back door "flew open" and a person came running out. Carlson watched the person run to a car that was parked between two garages in the alley. The person got into the car and drove off. Carlson later gave a detailed description of the car to the police. He called the police at 9:30 a.m. when he returned home from his school bus route.

Police officers, arriving on the scene, found Werdal's back door open and lights on in the house. Several first floor rooms had been ransacked. On the second floor, they discovered the body of Walter Werdal lying face down in a large pool of blood. They observed wounds on Werdal's head and saw a baseball bat lying near the body. A white tee shirt with the letter "W" marked on its label was covering the baseball bat.

Sergeant Bernard Bottema, a homicide detective assigned to investigate the Werdal homicide, observed bloodsplatters on the floor and ceiling which had radiated from Werdal's head. He concluded that at least one blow had been struck while Werdal was in a prone position and that whoever struck him would have blood on the

lower extremities. Bottema examined a basement window which appeared to have been forced open and found a dehumidifier directly below the window with a "shoe-tread imprint" on top of it. Surveying the kitchen, he discovered a small stand next to the stove from which something—"a microwave or stove" appeared to be missing. The stand was "greasy around the front" but "its rectangular center was clean." Bottema also observed Old Milwaukee beer cans in the kitchen. In the dining room and bedroom, he found cabinet and dresser drawers open, their contents strewn about the rooms. One of two jewelry boxes on the bedroom dresser had been pried open. Packages of unfiltered Camel cigarettes were located in various rooms throughout the house and a torn, empty Camel cigarette carton was found on the floor of Werdal's bedroom.

Werdal's girlfriend, Janet Larson, learned of Werdal's death later on November 4, 1988, and phoned the police because she had been in Werdal's house the evening before. The police asked Larson for the names of persons who might have a grudge against Werdal or might have owned a car matching the description given by Carlson. Larson gave police six or seven names including the name of defendant because he owned a car similar to that described by Carlson. The Bureau of Identification compared fingerprints recovered from the Werdal scene to the fingerprints of those on the list of suspects provided by Larson. A print belonging to defendant matched a latent print lifted from the scene of another homicide investigation, involving the death of Margaret Haugsrud on October 14, 1988.

The next day, November 5, 1988, Sergeant Bottema, after considerable effort, determined the address of the apartment where defendant lived with his sister and her boyfriend. Bottema drove to that address and observed a brown station wagon parked behind it that matched the description given by Carlson. In the meantime Sergeant Nelson, the chief investigator in the Haugsrud case, obtained a search war-

---

1. Defendant's pro se challenge to the validity of his indictment is without merit.

rant for the apartment. The warrant authorized the search of defendant, defendant's apartment and a brown Plymouth station wagon for items connecting defendant to the Haugsrud murder.

Nelson, Bottema and several other officers executed the Haugsrud warrant in the early afternoon of November 5, 1988. They seized a microwave, packages of camel cigarettes, cans of Old Milwaukee beer, a shotgun and defendant's shoes as evidence of the Werdal murder. A pool cue was seized a few days later under a subsequent warrant.

Defendant was arrested and his car was towed to the Minneapolis Police Department Forensic Garage. Police later searched the car and discovered a cassette player, a crushed package of unfiltered Camel cigarettes, and a white tee shirt which appeared to have blood on it. The tee shirt had a "W" marked on its label.

Defendant was questioned after his arrest by Sergeant Bottema. He denied that he knew Werdal. When informed of Janet Larson's contradictory statement, defendant recalled giving Werdal and Larson rides on several occasions but denied ever having been in Werdal's house. Defendant told Bottema that he had bought the microwave, some beer and a cassette recorder from some people for $50. Later, after the interview was terminated, defendant told Bottema he had purchased those items on Friday morning, November 4, 1988, at 8:00 a.m., from Janet Larson and an Indian male whom he did not know.

At trial defendant claimed that Janet Larson had murdered Werdal. He testified that he was at Werdal's house at 3:30 a.m. on November 4, 1988 to pick up Janet Larson and that Werdal was dead when he arrived. The jury found defendant guilty as charged. He was sentenced to life imprisonment, the sentence to be served consecutively to another life sentence for an earlier murder conviction in connection with the death of Margaret Haugsrud. This appeal followed.

1. Defendant first contends that he is entitled to a new trial because of misconduct by the prosecutor in repeatedly eliciting, from a chief investigative police officer, the officer's opinion that defendant was guilty of Werdal's murder and in making improper statements in closing argument.

■ The prosecutor did ask Sergeant Bottema if, in his opinion, defendant killed Werdal. This line of questioning occurred on redirect after defense counsel had elicited from Bottema, on cross examination, that Bottema did not know who killed Werdal because he was not there. It was apparent that Bottema's review of the evidence formed the basis for his belief that defendant killed Werdal and that this belief led to his arrest of defendant. On recross, defense counsel tried to establish that Bottema had an interest in seeing defendant convicted. On redirect, the prosecutor asked, "Do you have an opinion of who is the murderer of James Werdal?," to which Bottema answered, "I expressed it."

Although, under Minn.R.Evid. 704, testimony in the form of an opinion otherwise admissible is not objectionable because it bears directly on an ultimate issue, this court has not allowed ultimate conclusion testimony which embraces legal conclusions or terms of art. *See State v. Saldana*, 324 N.W.2d 227, 30–231, 231 n. 5 (Minn. 1982) (while expert may "testify to observations of physical and emotional conditions," expert's conclusion that person examined was "raped" is inadmissible). Here, however, the record shows that the officer himself avoided the legal term "murder" and expressed his opinion in terms of who "killed" the victim. This conclusion was factual rather than legal and was offered in response to leading questions by both the prosecutor and the defense attorney. Hence, we find no error or misconduct prejudicing the defendant.

■ Defendant claims that several remarks made by the prosecutor in closing argument constituted misconduct. A prosecutor's closing argument should be based on the evidence presented at trial and inferences reasonably drawn from that evidence. It should not be calculated to inflame the passions of the jury or prejudice

the jury against the defendant. *State v. Clark*, 296 N.W.2d 359, 371 (Minn.1980) (citing *State v. Perry*, 274 Minn. 1, 142 N.W.2d 573 (1966)).

During closing argument, the prosecutor first, after describing Werdal as a lonely old man who drank a lot, asked the jury, "Should we care?," and answered, "Sure we should care." Next, the prosecutor, while commenting that defendant had already been sentenced to life in prison, asked the jury, "Does that mean that this one should be a freebie?" Later, the prosecutor said, "The prosecutor hasn't made any deals in this case, and I ask you not to either * * * "

■ Although the "should we care?" remark constituted an appeal to jurors' sympathy, the prosecutor's remarks, overall, urged the jury to convict on the evidence and not on sympathy. The prosecutor's reference to whether this case should be a "freebie" referred to defendant's admission on the witness stand that he had previously been convicted for first degree murder and had received a life sentence. Similarly, the prosecutor's request that the jury not make any "deals" with defendant reflected defendant's own announcement at trial that no deals had been made. Cumulatively, however, these statements carry "law and order" overtones of which this court has frequently disapproved. *See, e.g., State v. Langely*, 354 N.W.2d 389, 401 (Minn.1984). Although we find no prejudice to the defendant in this instance, prosecutors would be well advised to heed our admonitions concerning this type of argument.

■ During closing argument the prosecutor also made numerous comments upon defendant's prior criminal record. He referred to defendant three times as a convicted thief, twice called him a burglar and twice referred to defendant as "the murderer." He also referred to defendant as a convicted possessor of stolen property. Defendant argues that the prosecutor attempted to use his prior convictions not to impeach his credibility but to show his criminal disposition and to improperly inflame the jury.

Most of the references to defendant's prior convictions occurred during a portion of the state's argument on credibility where they were proper as probative of defendant's capacity for truth telling. Minn.R.Evid. 609. We are concerned however, that, as opposed to noting that defendant had been convicted of these offenses, the prosecutor personified defendant as "the convicted thief," "the burglar" and "James DeWald the murderer." Moreover, the prosecutor twice raised defendant's criminal past outside the credibility context. When discussing motives for Werdal's death, he stated "Jim DeWald's a thief" and later referred to defendant as "this thief over here." These comments constituted gratuitous character attacks that exceeded the permissible inference of impeachment created by Minn.R.Evid. 609.

Because the prosecutor exceeded the limits of permissible conduct, we consider the effect of these comments upon the jury verdict, notwithstanding defense counsel's failure to object. *State v. Brown*, 348 N.W.2d 743, 747 (Minn.1984). We find, however, that no undue prejudice inured to the defendant in this case. The effect of these comments on the jury was diminished by the trial court's ample cautionary instructions that defendant's previous convictions were only relevant insofar as they "may affect his credibility" and that the jury "must not consider any previous conviction as evidence of guilt of the offense for which he is on trial here." Further, the jury acquitted defendant of one count of first degree murder, indicating that the members of the jury were not unduly inflamed by the prosecutor's comments. *See State v. Glaze*, 452 N.W.2d 655, 662 (Minn. 1990). We hold that the prosecutor's conduct, though in part exceeding permissible bounds, was not so prejudicial as to require a new trial.

■ 2. Defendant's second claim to a new trial is based on ineffective assistance of counsel, in that his counsel failed to seek the suppression of defendant's prior convictions and affirmatively disclosed defendant's criminal record, including his first

degree murder conviction incurred only the week before.

■ The standard applied by this court in claims of ineffective assistance of counsel is "whether the representation and the assistance were reasonable in light of all the circumstances." *Dent v. State,* 441 N.W.2d 497, 500 (Minn.1989) (citing *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)). The defendant must show that, but for the errors of counsel, the outcome of the trial would probably have been different. *Gates v. State,* 398 N.W.2d 558, 562 (Minn. 1987). This court has held that the failure to move for suppression of certain evidence is not ineffective assistance of counsel where a valid strategic reason for such failure can be inferred from the record. *State v. Heinkel,* 322 N.W.2d 322, 326 (Minn.1982). The record in this case shows that defense counsel elicited testimony from defendant about his criminal past in order to explain why defendant lied to police and why he failed to call the police when he discovered Werdal's body. Defendant offered his previous life sentence as evidence that he had nothing to gain from lying to the jury in this case.

In light of these apparent strategic uses of defendant's criminal history, and the fact that his convictions would likely have been admitted for impeachment purposes, defendant has not met the burden of showing that his representation by trial counsel was unreasonable or that the outcome of the trial would have been different but for the errors of counsel. We hold defendant was not deprived of the effective assistance of counsel.

3. Defendant next claims that the trial court erred in admitting evidence seized during the execution of search warrants involving defendant, his apartment and his car. Police officers acted pursuant to a search warrant issued for the Haugsrud murder. In the course of executing that warrant, they seized items not listed in the warrant which were subsequently admitted into evidence against defendant at trial for the Werdal murder. Defendant contends that the seizure of these items was constitutionally impermissible.

Defendant argues that the warrant issued on November 5, 1988, was invalid because the information in the supporting affidavit relating to the October 14, 1988 Haugsrud murder was too stale to support a finding of probable cause to believe that the items sought would still be in defendant's possession.

■ A number of factors may be examined in determining whether the information supporting a search warrant is stale. *See State v. Yaritz,* 287 N.W.2d 13, 16 (Minn.1979). Among those factors are the age of the person supplying the information, whether there is any indication of ongoing criminal activity, whether the items sought are innocuous or incriminating, and whether the property sought is easily disposable or transferable. *State v. Jannetta,* 355 N.W.2d 189, 193–94 (Minn. App.1984) (citing *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78 (1975), *aff'd sub nom. Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). Probable cause has been held not stale even after the passage of several months where the items sought are of "enduring utility to their taker." *State v. Flom,* 285 N.W.2d 476, 477 (Minn.1979).

■ A number of the items listed in the November 5 warrant were those missing from the Haugsrud home, including Haugsrud's purse, identification, personal property and jewelry, including a piece of jade jewelry. Police also sought a knife or knives of the "Prince Devonshire" brand, bloodied clothing, a pair of shoes with grooved soles that might have glass imbedded in them, and a blunt object that may have been used to assault the deceased. Defendant, citing *Flom,* argues that because none of the items sought were of enduring utility to their taker, there was no probable cause to believe that the items would still be in defendant's possession three weeks after the Haugsrud homicide. This argument is not persuasive.

First, the jewelry and other personal property missing from the Haugsrud residence may have had enduring utility. Sec-

ond, a number of items sought by police, although ultimately incriminating, may have appeared innocuous to defendant. Police sought "Prince Devonshire" knives similar to the one found in Haugsrud's back. It was reasonable to believe that defendant would not have disposed of knives not used in criminal activity. Police also sought a blunt instrument and shoes, both of which might appear innocuous to their owner. We conclude the search warrant was valid because the information pertaining to the items sought was not too stale to support a finding of probable cause.

■ Defendant next argues that even if the search warrant is valid, seizure of items not listed on the warrant was not justified by the "plain view" doctrine because the police did not have probable cause to believe that the items discovered were evidence of the Werdal murder.

■ It is well established that under certain circumstances, items not named in a search warrant may properly be seized. *State v. Streitz*, 258 N.W.2d 768, 772 (Minn.1977). The plain view exception to the particularity requirement of the Fourth Amendment is satisfied where an officer lawfully executing a search warrant authorizing the seizure of certain items inadvertently comes upon other items whose incriminating nature is immediately apparent. *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *State v. Severtson*, 304 Minn. 487, 232 N.W.2d 95 (1975)). In order to seize items in plain view, officers must have probable cause to believe the property is subject to seizure. "Reasonable suspicion" on the part of police officers is insufficient to invoke the plain view doctrine. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987). *See also Severtson*, 304 Minn. at 490, 232 N.W.2d at 97.

Even though police had only "reasonable suspicion" concerning the Werdal case at the time they applied for the Haugsrud warrant, when they entered defendant's home under the Haugsrud warrant, they saw a number of items in plain view which they had probable cause to believe were connected with the Werdal murder. Probable cause exists where "the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of crime." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (citation omitted). Moreover,

> * * * in determining whether the stolen nature of the property observed in plain sight is immediately apparent, the police may consider such things as any background information they have which casts light on the nature of the property and whether the items are unusual in number or are strangely stored or located.

*State v. Smith*, 261 N.W.2d 349, 352 n. 2 (Minn.1977) (citing *State v. Streitz*, 258 N.W.2d 768 (1977)).

Here the police first observed a microwave in defendant's kitchen. They knew that a similar microwave was missing from the Werdal home. The microwave was greasy and was approximately the same size as the one police believed was missing from a greasy stand in the Werdal kitchen. It was a Panasonic model with a rotisserie inside, also consistent with the information the police had regarding the Werdal microwave. In addition, the microwave was found sitting in a "children's chair," low to the ground, "kind of tipsy," unplugged and not where "it normally would have been if it was being used regularly by the people in the apartment."

Second, police observed the same type of unfiltered Camel cigarette packages in defendant's apartment as they had seen strewn throughout the Werdal home.

Third, police observed what appeared to be blood on defendant's left tennis shoe. Sergeant Bottema, after investigating the scene of the Werdal homicide had concluded that whoever killed Werdal "would have blood on his lower extremities, probably his left side." Finally, police knew that a car similar to defendant's had been seen leaving the Werdal home on the night when Werdal was killed.

All of this information was sufficient to establish probable cause that these items were connected to the Werdal homicide. Thus, the microwave, the cigarettes and the shoes were properly seized. The trial court did not err in admitting evidence which was properly seized under the plain view doctrine when police executed a valid search warrant pertaining to a separate homicide investigation.[2]

Defendant also contends that the seizure and subsequent search of his car was impermissible. Defendant asserts that nothing in the search warrant application supported the search of defendant's vehicle. However, when police have probable cause to believe a car has been used as an instrumentality of a crime and that it contains evidence of a crime, it is constitutionally permissible to immediately search the car without a warrant. *See State v. Roy*, 265 N.W.2d 663, 664 (Minn.1978).

Here, by the time officers seized the car, they had discovered evidence of the Werdal murder in defendant's home, including the microwave and the blood-spattered shoes. They also observed that defendant's car matched the description given of the car seen leaving the Werdal scene. On that basis, they had probable cause to believe that defendant's car had been used as an instrumentality in the Werdal murder and that it might contain evidence of that crime. Thus, under *Roy* it was permissible to search the car without a warrant.

In this case, the police, rather than search the car on the premises, towed it to the Minneapolis Forensic Garage where it was later searched pursuant to a warrant. When there is probable cause to search a car, it is "constitutionally permissible to take the automobile * * * to the station and search it after a warrant was obtained." *State v. Jankowski*, 281 N.W.2d 717, 719 (Minn.1979) (citing *State v. Roy*, 265 N.W.2d 663 (Minn.1978), *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26

L.Ed.2d 419 (1970)). The trial court, therefore, did not err in admitting evidence obtained in the car search.

4. Finally defendant contests the legal sufficiency of the evidence against him. Evidence of defendant's guilt is ample, albeit circumstantial. Defendant argues it is not inconsistent with his proffered theory that Janet Larson killed Werdal.

The standard of review of a jury conviction in an insufficiency-of-evidence appeal is whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the state, the jury could reasonably find the defendant guilty beyond a reasonable doubt. In conducting this review, the court assumes the jury believed the state's witnesses and disbelieved evidence to the contrary. The jury determines the credibility and weight to be given the testimony of witnesses.

*State v. Boitnott*, 443 N.W.2d 527, 531 (Minn.1989) (quoting *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988)).

A conviction based on circumstantial evidence merits stricter scrutiny. The evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt.

*State v. Bias*, 419 N.W.2d 480, 484 (Minn. 1988) (citing *State v. Race*, 383 N.W.2d 656, 661 (Minn.1986)).

Much of the evidence in this case has been set forth above. The evidence of defendant's guilt also includes the following:

Defendant had known Werdal for six or seven years. It was "common knowledge" among people who knew Werdal that he kept money in his house.

Carlson knew Janet Larson and testified that she was not the person who ran from

---

**2.** Defendant's argument that suppression should result from the alleged "bad faith" on the part of the officers obtaining the Haugsrud warrant as a pretext to look for evidence of the Werdal murder, is rejected pursuant to *Wensman v. State*, 342 N.W.2d 150, 152 (Minn.1984)

("[s]earches and seizures should be examined according to a standard of objective reasonableness without regard to the good faith or bad faith of the officer." (citing *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).

the Werdal house after the struggle he observed between two people in the Werdal attic. The station wagon Carlson saw leaving the scene he later positively identified as defendant's station wagon.

Defendant's fingerprint was found on a torn, empty cigarette carton in Werdal's bedroom and at least one shoe print impression unique to defendant's shoes were found in Werdal's home.

Blood spattering at the scene of the killing indicated that the "whoever struck that blow would have blood on their lower extremities, most probably on their left side." Blood found on defendant's left shoe was not defendant's blood and was consistent with Werdal's blood. Blood on the white tee shirt with the "W" on the label, found in defendant's car was also consistent with Werdal's blood. It was not defendant's blood. The tee shirt found in defendant's car was similar to the white tee shirt with a "W" marked on it found covering the bat lying next to Werdal's body. It could be inferred that the "W" stood for Werdal.

The microwave, shotgun, and pool cue found in defendant's apartment belonged to Werdal and the cassette recorder found in defendant's car belonged to Werdal's grandson who stored it in Werdal's attic.

Defendant testified at trial that Werdal was dead when he arrived at Werdal's house to pick up Janet Larson at about 3:30 a.m. on November 4, 1988. He stated that Janet went out to the car before he did, and that he walked out and smoked a cigarette in the back yard before getting into the car and driving off. This testimony was contradicted by Carlson's testimony that one person ran out of the house, and by the blood spatters on defendant's shoe which were inconsistent with his account wherein he merely approached the dead body.

Other testimony at trial indicated that Janet Larson's relationship with Walter Werdal was marked by alcoholism, domestic violence and Larson "using" Werdal to get money and material goods. She was at the Werdal residence the night before Werdal died, was moving out the last of her things, and by her own admission was "quite drunk." Larson's estranged daughter, Domita Larson, testified that her moth-

er called her at 10:00 a.m. on November 4, 1988 (before reports of the killing could have been televised) and told her that she had fought with Werdal and he was dead.

Larson testified that she left Werdal's home at 8:40 p.m. on November 3, 1988. This testimony was corroborated by Wanda LaDuke who was with her and by the cab driver who picked up Larson and LaDuke. The medical examiner estimated that Werdal was killed between midnight and 9:00 a.m. on November 4, 1988.

LaDuke testified she was with Larson at the house LaDuke shared with Larson's daughter Shellann that night and saw Larson there at midnight when LaDuke went to bed. LaDuke observed that Larson was still sleeping both at 4:00 and 6:30 a.m. on November 4, 1988.

Larson gave defendant's name to police as someone who knew Werdal and had a car matching Carlson's description, but she also gave police several other names. She did not know defendant's address and thus could not have gone by defendant's apartment and offered to sell him the microwave and other items in exchange for cocaine as defendant testified.

When reviewing a conviction based on circumstantial evidence, this court "recognize[s] that a jury normally is in the best position to evaluate circumstantial evidence, and that their verdict is entitled to due deference." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). Also, "the jury determines the credibility and weight given to the testimony of individual witnesses." *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988).

All of the physical evidence in this case is consistent with defendant's guilt. The jury believed the state's witnesses. There is no evidence to lead to the rational conclusion that Janet Larson killed Walter Werdal. The evidence is sufficient to sustain defendant's convictions for murder in the first degree.

Affirmed.