STATE of Minnesota, Respondent,

v.

David Wayne WASHINGTON, Appellant.

No. C0-93-1326.

Supreme Court of Minnesota.

Aug. 26, 1994.

John M. Stuart, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and James C. Backstrom, Dakota County Atty., Nicole E. Nee, Charles E. MacLean, Asst. County Attys., Hastings, for respondent.

## OPINION

GARDEBRING, Justice.

Following a jury trial, appellant David Wayne Washington was convicted of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder and two counts of second-degree murder.[1] Appellant appeals on the grounds that the prosecutor committed misconduct during closing argument and that a witness' statements to the police were improperly admitted during appellant's trial.

This case arises out of the death of Edward ODneal, a 16–year–old St. Paul youth whose body was found in Lilydale Park in St. Paul on November 6, 1992. The events which culminated in ODneal's death began on November 4, 1992, when appellant and a 15–year–old girl were arrested for shoplifting. ODneal was with them, and appellant handed his pouch to ODneal when appellant was detained. When appellant asked to get the pouch back, the store sent a clerk to get it, but ODneal ran away with it. Several witnesses testified at trial that appellant became angry with ODneal when ODneal did not return the pouch, which may have contained appellant's money, drugs, or handgun.

Appellant did not testify during his trial, but his statement to the police was read into the record. Appellant admitted that he shot ODneal, but claimed that the gun had gone off accidentally. Appellant told police that on the day of the murder he and three other men, Chauncey Stockette, Michael Wordlow, and John Andren, had gone to a liquor store in Wisconsin with ODneal in Andren's cab. On the way back, they stopped at Lilydale Park. Appellant told police that Stockette first held the gun to ODneal's head and tried to get him to reveal the location of money missing from the pouch. Appellant stated that when he took the gun and held it to ODneal's head, the gun fired accidentally. He also told police that "Cuban," who police later identified as Alexis Jorge, had supplied the gun.

Most of the testimony implicating appellant came from the other men who were present when the killing took place. All three men were granted use immunity to testify at appellant's trial. Chauncey Stockette and John Andren testified. Michael Wordlow, who was present at the shooting, refused to testify, as did Alexis Jorge, who was not present when ODneal was killed. Jorge and Wordlow's statements to police were admitted over defense counsel's objections.[2]

Stockette and Andren both testified that appellant was the leader of a group called the "GDs" of which Stockette, Andren, and Wordlow were members. ODneal had also become a member. Andren identified appellant's pouch at trial and testified that appellant kept his .22 caliber handgun in the

---

1. Appellant was indicted by a grand jury on two counts of first-degree murder, two counts of second-degree murder, and two counts of conspiracy to commit first-degree murder. The jury acquitted appellant of first-degree murder committed during the course of a kidnapping and conspiracy to commit first-degree murder while kidnapping.

2. A police officer testified that Wordlow told the police that a plan was concocted on the evening of November 5, 1992 to kill ODneal. Wordlow's written statement to the police was admitted into evidence and given to the jury, but was not read into the record.

pouch. Both Stockette and Andren also identified the shotgun used to kill ODneal.

Stockette and Andren both testified that appellant began planning to kill ODneal during the afternoon of November 5, 1992. Andren testified that he drove appellant and Alexis Jorge ("Cuban") to retrieve a gun and that appellant told him Stockette had to "deal with" ODneal. Appellant told Stockette that he had obtained a shotgun and that Stockette had to kill ODneal. Andren testified that appellant instructed him to feign car trouble on the way back from a trip to Wisconsin with ODneal. When Andren stopped the car, appellant and Stockette went to the trunk to retrieve the shotgun and ODneal was asked to get out of the car. When ODneal left the car, both Stockette and Andren testified that Stockette put the gun to his head, but told appellant that the gun didn't work. According to both witnesses' testimony, appellant then took the gun and fired it at ODneal's head. Stockette and Andren also testified that after the killing, the men returned to St. Paul, where they attempted to clean the cab which had been used in the murder scheme. Both Stockette and Andren testified that they were warned by appellant not to tell anyone about the incident. Andren also testified that prior to the incident appellant told him that appellant would kill anyone who "snitched on him about anything."

Andren also testified that he lied about these events when testifying before the grand jury because he was afraid of appellant. He admitted that he had given three statements to police in addition to his testimony before the grand jury and had told a different story each time.

Alexis Jorge refused to testify in spite of a grant of use immunity and was found to be in contempt of court. Jorge had assisted police in locating the shotgun where it was hidden at his house. His statements to police were admitted at trial over defense counsel's objection that they were hearsay and that their admission would violate the defendant's right to confront the witness. A police officer testified that Jorge admitted knowing appellant and John Andren, but denied knowing Stockette and Wordlow. Jorge admitted to

police that on the night of the incident, appellant asked him if he could use his "gauge." Appellant had told Jorge he wanted to get his "stuff" back, and Andren drove Jorge to get the shotgun. Jorge gave the shotgun to appellant who left with John Andren, ODneal, and two other men. When they returned, appellant gave the gun back to Jorge and Andren gave Jorge a ride to return the gun to his house.

A firearms examiner for the state Bureau of Criminal Apprehension testified that he examined the shotgun introduced into evidence. He testified that the gun had a 4¾ pound trigger pull, within the average range for a shotgun, and that it could not be fired without at least 4 pounds of pressure on the trigger. Further, the gun had to be cocked before it could be fired, and the gun fired properly when tested.

A crime lab officer examined the car driven by John Andren. She found what preliminary tests showed to be "presumptive" blood inside the cab on the inside panel of the front passenger door, around the door handle and the window handle. She also found suspected blood or pieces of suspected bone matter on the taxi sign on the roof, on the back door just above the door frame, around the trim of the back window, and on the trunk and the lower edge of the back window. The blood appeared to be diluted, possibly with water.

On appeal, appellant makes two claims: first, that the prosecutor improperly introduced character evidence in his closing argument, and second, that admission of certain hearsay statements was error. We affirm the conviction.

As to the first issue, appellant argues specifically that the prosecutor improperly commented on defendant's character by reference to an "Aesop's fable" about a scorpion and by making the statements, "[that's] just the way defendant is," "I can't help it, it's my nature," and "he can't help it." The state admits that the fable was used to show that some people are capable of cruel acts and that appellant "was one of those people." The state argues that the comments merely reflected a permissible inference based on evidence admitted at trial.

During his closing argument, the prosecutor stated:

I submit there were three primary reasons for the killing. Number one was power; number two was Defendant's anger; and number three was *just the way the defendant is.* * * *

Lots of people get angry, lots of people want power, but few people kill. The Defendant is one of those few people. I think you've probably all heard about Aesop's fables. He liked to write stories about animals that really referred to human *characteristics* and human conditions. * * *

Some of you might be familiar with the story of the tortoise and the scorpion. One day the scorpion was walking through the woods, he came upon a river. The scorpion can't swim, and he wanted to get across that river. He happened to see a tortoise in the river and he had an idea. He called out, oh, Mr. Tortoise, can you come here a minute? The tortoise said no, I know about your stinger and I'm not coming near you. The scorpion said well, I'd like to have a ride if I could. The tortoise says well, if you ride on me you'll sting me and I'll drown. The scorpion says, oh, no, I won't sting you. Think about it. If I get on your back and we start across the river, if I'm gonna sting you, you're gonna drown but I'm gonna drown too. The tortoise thought about that and realized the scorpion was right. The scorpion said, look, I won't be safe until I'm on the bank of the other side, and then you'll be safe, too. The tortoise went, gee, he is right. Maybe I'll do that, maybe I can be important, too. Okay, Mr. Scorpion, I'll let you on my back.

The scorpion climbed on the tortoise's back, they started going across the river. They got about a fourth of the way through, the scorpion says, gee, this is really a smooth ride, I really appreciate your help. The tortoise is thinking maybe I made a new friend. They get halfway across and the scorpion says, this is really a kind favor you've done for me. I really owe you. I'll never forget this. The tortoise then figures great, I've made a new friend. Three-fourths of the way across the tortoise says, now, remember your promise to me, you're not going to sting me, are you? The scorpion says, oh, no. And suddenly thrusts his stinger into the head of the tortoise. As they both started going down the tortoise said, how could you do that to me? I was helping you. Why sting me? The scorpion smiled and said, *I can't help it, it's my nature.*

Now, to what happened in that basement at 1028 Edgerton. Chauncey Stockette is told by the Defendant, "Assume the six-point stance." Eddie says, "You're not gonna hit him, are you?" The Defendant says, "No." Pow, right in the face. Think next about what happened next to the cab in Lilydale. The Defendant takes that gun from Chauncey. Eddie says, "You aren't going to kill me, are you?" The Defendant says, "No." Pow. Right in the head. *He can't help it.*

(Emphasis added). Appellant's attorney did not object to the prosecutor's comments.

Minn.R.Evid. 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Evidence of a pertinent trait of character of an accused may be offered by the state only to rebut such evidence offered by the accused. Minn.R.Evid. 404(a)(1).

▮▮▮ We have previously found character attacks to be improper comments during a prosecutor's closing argument. *See State v. DeWald,* 463 N.W.2d 741, 744–45 (Minn. 1990). In reviewing the language chosen by the prosecutor to narrate the fable, we conclude that there was an improper reference to appellant's character. There can be no other reasonable reading of the phrases "just the way the defendant is," "I can't help it, it's my nature," and "he can't help it." Appellant did not testify at his trial and did not introduce any evidence regarding his character; thus any reference to his character by the prosecution was improper.[3] Having con-

3. Appellant also objects to the fable and the

prosecutor's comments on the ground that they

cluded that the comments were improper, we must apply the two-tier test for examining improper arguments set out in *State v. Boitnott,* 443 N.W.2d 527, 534 (Minn.1989). Inasmuch as the conduct in this case was less serious misconduct, the test is whether it played a substantial part in influencing the jury to convict appellant. *State v. Caron,* 300 Minn. 123, 128, 218 N.W.2d 197, 200 (1974). We hold that it did not.

We considered several factors in concluding that reversal is not necessary despite misconduct during the closing argument. First, defense counsel did not object to the prosecutor's closing argument. Defense counsel's failure to object to the comments or to seek a curative instruction has "weighed heavily" in our previous decisions not to reverse, because the trial court might have been able to "ameliorate the effect of improper prosecutorial argument." *State v. Brown,* 348 N.W.2d 743, 747 (Minn.1984); *State v. Kline,* 306 N.W.2d 132 (Minn.1981).

▇ The trial court's instructions to the jury are also relevant in determining whether the jury was unduly influenced by the improper comments. In this case, the trial judge instructed the jury that the arguments of an attorney are not evidence and that the jury should not draw any inference from the fact that the defendant did not testify. The trial judge also warned the jury that they should not permit sympathy, prejudice or emotion to influence their verdict. *See State v. Hawkins,* 511 N.W.2d 9, 13 (Minn.1994).

▇ The jury's verdict in this case also supports the state's claim that the comments did not unduly influence the jury. The jury convicted appellant of charges related to premeditated murder, but acquitted him of charges related to crimes committed while committing a kidnapping. Where the jury has acquitted the appellant of some counts, but convicted the appellant of others, we

view the verdicts as an "indica[tion] that the members of the jury were not unduly inflamed by the prosecutor's comments." *State v. DeWald,* 463 N.W.2d 741, 745 (Minn. 1990) (citing *State v. Glaze,* 452 N.W.2d 655, 662 (Minn.1990)).

▇ Further, the nature of the non-objectionable part of the prosecutor's closing argument supports our conclusion that the error was not reversible error. The prosecutor's argument "must be taken as a whole to determine if it provides a basis for reversal." *State v. Daniels,* 332 N.W.2d 172, 180 (Minn. 1983). *See State v. Stufflebean,* 329 N.W.2d 314, 318 (Minn.1983); *DeWald,* 463 N.W.2d at 745. In this case, the only improper action alleged is the telling of the fable and linking it to appellant's character. The improper argument is found in only 4 of 45 pages of transcript of the closing argument. The prosecutor did tell the jury members that, "the only evidence you should consider is what you heard from the witness stand and the physical evidence. What I'm saying is not evidence. If I misstate the evidence or it disagrees with your recollection, follow your recollection." The remainder of the closing argument was devoted to arguing the facts and applying them to the charges against appellant.

▇ Finally, we also consider the strength of the other evidence against the defendant in determining if an improper comment influenced the jury. *Hawkins,* 511 N.W.2d at 13; *Caron,* 218 N.W.2d at 200; *Stufflebean,* 329 N.W.2d at 319; *Kelley,* 295 N.W.2d at 523. In this case, the evidence against appellant was very strong. He admitted to holding the gun to the victim's head. Expert testimony at trial established that the gun used had at least a 4 pound trigger weight and that it functioned normally. Appellant admitted to being angry with the victim, whom he

---

improperly diverted the jury's attention from making its determination of guilt or innocence by weighing the evidence admitted at trial. The A.B.A.'s standards governing the conduct of prosecutors provide that, "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law."

I ABA Standards, The Prosecution Function, Standard 3–5.8(d) (2d ed. 1982); *see also State v. Kelley,* 295 N.W.2d 521, 523 (Minn.1980). Appellant asserts that the comments encouraged the jury to convict based on an assessment of his character, rather than on what the evidence demonstrated. We agree the comments were improper.

thought had stolen his property, and appellant's accomplices testified that appellant planned and committed the murder. The strength of the evidence in this case is such that the comments were unlikely to have substantially influenced the jury.

We therefore conclude, based on all of these factors, that the prosecutor's improper reference to appellant's character during his closing argument did not substantially influence the jury to convict.

Appellant next contends that the admission of testimony regarding a witness' statements to the police was error. Alexis Jorge refused to testify at appellant's trial despite a grant of use immunity. The trial court allowed a police officer to testify to Jorge's statements to police. Defense counsel objected to the admission of Alexis Jorge's statements to the police as hearsay and a violation of defendant's Sixth Amendment right to confront the witnesses against him.[4] There was a discussion on the record leading up to the court's decision to admit the hearsay at trial. Jorge was present and represented; his attorney recommended that he exercise his Fifth Amendment right to refuse to answer questions despite a grant of use immunity. No further reason was given for Jorge's refusal to testify.

■ Evidentiary and procedural rulings generally rest within the trial court's discretion and we will not reverse them absent a clear abuse of discretion. *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). In this case, the trial court admitted hearsay statements without finding that they were admissible under an exception to the general rule that hearsay statements are not admissible to prove the truth of the matter asserted, and without finding that appellant's right to confront the witness was vindicated.

We first consider whether Jorge's out-of-court statements fell within an exception to the rule excluding hearsay statements, Minn. R.Evid. 802. Under Minn.R.Evid. 804(b)(3), a hearsay statement, which "at the time of its making * * * so far tended to subject the declarant to * * * criminal liability, * * *

that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," is admissible. We conclude that Jorge's statements may have met the requirements of this exception because they inculpated him in providing the gun which appellant used to commit the murder.

■ Even assuming the statement was admissible under a hearsay exception, however, in this case the trial court should have engaged in an additional two-step analysis to determine whether the application of a hearsay exception to admit the testimony would violate the confrontation clause of the Sixth Amendment. *State v. Hansen,* 312 N.W.2d 96, 102 (Minn.1981) (citing *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980)). First, the necessity of the hearsay declaration must be addressed. *Id.* The "necessity" requirement may be fulfilled by a showing that the declarant is unavailable. *Id.* A refusal to testify on the basis of Fifth Amendment privilege is sufficient to constitute unavailability for purposes of the confrontation right. *Id.* Thus, the first part of the analysis was satisfied in this case.

Second, the reliability of such declarations must be examined. *Id.* We have previously stated that, "demonstrating that the statements bear sufficient 'indicia of reliability' to avoid a conflict with the confrontation clause" is a "much more difficult requirement." *Id.* We further noted that:

> [U]nsworn, *ex parte* statements made during police questioning have traditionally been considered as inherently untrustworthy. *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1102–03 (5th Cir.1981). Indeed, the purpose of the confrontation clause is to prohibit these *ex parte* declarations from being introduced at trial. *California v. Green,* 399 U.S. 149, 156 [90 S.Ct. 1930, 1934, 26 L.Ed.2d 489] (1970).

*Id.* at 103. The United States Supreme Court has also held that reading the jury the confession of an accomplice who invoked his Fifth Amendment privilege violated the de-

---

4. The Sixth Amendment requires that "[i]n all criminal prosecutions the accused shall enjoy the

right to be confronted with the witnesses against him." U.S. Const. amend. VI.

fendant's right of confrontation. *Douglas v. Alabama,* 380 U.S. 415, 419–20, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965).

There is an exception to this rule which may have applied to Jorge's statement. A defendant may waive or forfeit his right to confrontation through his own actions; "a defendant who procures the absence of a witness by threats impliedly waives his right to confrontation." *Hansen,* 312 N.W.2d at 103–04.[5] We require, however, "evidence that defendant, or [some]one acting on his behalf, had intimidated the witnesses by general or specific threats of reprisal." *Id.* at 105. In this case, there is evidence in the record, through Stockette and Andren's testimony, that appellant made specific threats that he would exact retribution against anyone who told about his role in ODneal's killing. Based on the record before us, however, we cannot conclude that Jorge was present or heard any of those threats. Furthermore, neither Jorge nor his counsel cited threats or fear of reprisal as a reason for Jorge's refusal to testify. As in *Hansen,* in the present case, the trial court had evidence of threats to other witnesses, but there is no evidence that the witness in question had knowledge of such threats. The trial court admitted testimony regarding Jorge's statements to police without finding that the admission of the statements satisfied the requirements of the confrontation clause as set out in our decision in *Hansen.* Because we cannot conclude, based on the record before us, that the confrontation clause requirements were met, we must conclude that it was error to admit the testimony.

Before we can find such a federal constitutional error harmless, we must be able to conclude that it is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), *reh'g denied,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *State v.*

*Larson,* 389 N.W.2d 872, 875 (Minn.1986). For the reasons stated in our discussion of the prosecutorial misconduct, we find that the error was harmless in this case. Although "[e]vidence admitted in violation of the confrontation clause is not harmless error unless the evidence in other respects is overwhelming," *Hansen,* 312 N.W.2d at 105, Jorge's statements to police were cumulative, and merely corroborated other witnesses' testimony. Appellant's own inculpatory statements to police, viewed together with the testimony of the firearms expert, the testimony of the two eyewitnesses, and the statement of another out-of-court declarant provided overwhelming evidence of appellant's guilt.

Appellant further alleges that Stockette and Andren committed perjury at the grand jury hearing and at his trial. Andren and Stockette's testimony before the grand jury was inconsistent with their testimony at trial. Before the grand jury, however, each had waived immunity and at trial each was granted use immunity. Both were cross-examined at trial regarding the inconsistencies or changes in testimony. The weight and credibility to be given disputed evidence are determinations to be made by the jury. *State v. Boyum,* 293 Minn. 482, 197 N.W.2d 218 (1972). There is no merit to appellant's argument.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.

---

5. We have some indication in the record that this is the exception to the confrontation clause's requirements that the trial judge may have considered when he admitted the testimony. When Jorge's statements were admitted, a discussion had already taken place regarding the admission of Michael Wordlow's out of court statements. Wordlow, like Jorge, refused to testify despite a grant of use immunity. The court admitted an out-of-court statement to police which was transcribed and signed by Wordlow. The court found the hearsay admissible because Wordlow's unavailability was provoked by appellant's "threat of secrecy and silence and the threat that he would kill anyone that told on him."