STATE of Minnesota, Respondent,

v.

Tommie NMN ATKINS, Appellant.

No. C8–95–333.

Supreme Court of Minnesota.

Feb. 16, 1996.

John M. Stuart, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

ANDERSON, Justice.

On March 6, 1994, the owner of the Snelling Motel in Minneapolis was beaten and then shot to death during the course of an attempted robbery by appellant, Tommie Atkins, and his accomplice, Robert Dixon. Atkins was indicted on two counts of first-degree murder—premeditated murder and intentional murder while committing or attempting to commit aggravated robbery. Prior to trial, the state dismissed the charge of premeditated murder. At trial, a jury found Atkins guilty of the remaining charge of intentional murder while committing or attempting to commit aggravated robbery under Minn.Stat. § 609.185(3) and Minn.Stat. § 609.05, liability for crime by another. On appeal, Atkins argues that the state's evidence is insufficient to support his conviction for first-degree murder, and contends that the prosecutor violated his right to a fair trial by committing misconduct.

Atkins' conviction arises out of an attempted robbery of the Snelling Motel in Minneapolis, Minnesota. On the night of March 6, 1994, the owner of the motel, Wesley Sankey, was beaten on the head with a clothes iron and then shot twice in the face at point-blank range with a .25 caliber semi-automatic pistol. The record does not establish who shot Sankey. Atkins confessed to the attempted robbery and admitted beating Sankey with the clothes iron, but denied shooting Sankey or even knowing that he was shot and killed until told so by the police subsequent to his arrest.

On the night Sankey was murdered, Sgt. Michael Green of the Minneapolis Police Department (MPD) received a 911 call requesting his presence at the Snelling Motel. When he and his partner arrived at the motel, they found Sankey's body slumped against the wall of the utility room located behind the lobby. Sgt. Green investigated the crime scene. On the floor near the lobby counter, Sgt. Green found a registration card with the name "Tony Hamilton" written on it. A bloody boot print was also found on a plastic floor mat in the lobby. Sgt. Green also discovered two spent .25 caliber shell casings and some bullet fragments in the utility room. The unopened cash drawer contained $433.50 and an unopened canvas briefcase containing $1,281.80 in receipts from the previous day was found a few feet from Sankey's body.

The next day, Sgt. Richard Edinger, the MPD officer assigned to investigate Sankey's murder, went to the crime scene. Lacking eyewitnesses or other direct evidence of who committed the murder, Sgt. Edinger focused his investigation on the registration card found by Sgt. Green. This focus for the investigation proved to be fruitful. Forensic testing of the registration card revealed fingerprints which were later identified through a computer search as being Atkins'. Based on the fingerprint match, the handwriting on the registration card was also checked against the known handwriting in Atkins' Hennepin County Economic Assistance file. On March 16, 1994, Sgt. Edinger was told by an MPD forensic document examiner that the handwriting on the registration card matched Atkins'. That same day, Sankey's widow told the police that she had found a third spent .25 caliber shell casing on a wooden shelf above the door in the utility room where Sankey's body was found.

Based on the handwriting and fingerprint matches, Sgt. Edinger obtained a search warrant for Atkins' apartment. But because the police suspected that Atkins did not act alone, they set up a surveillance team to watch Atkins' apartment rather than immediately executing the warrant. After several weeks of fruitless surveillance, the police obtained a second search warrant for Atkins' apartment and arrested Atkins in his apartment on the morning of April 8, 1994. While searching Atkins' apartment, the police seized a pair of boots and a driver's license which was issued in the name of Robert Dixon and which was lying on the apartment

floor. The police also seized three jackets, one of which showed traces of stains on the arms and lining.

After the police arrested Atkins, they took him to the homicide division of the MPD where he was interrogated by Sgt. Edinger and Sgt. Steven Berg. Atkins ultimately made three formal statements. In his first formal statement, taken the day of his arrest, Atkins denied any knowledge of the incident, stating that he had never been to the Snelling Motel, did not know where the motel was, and had not been involved in a robbery in the recent past. Although Dixon was not a suspect at this point in the investigation, the police asked Atkins if he knew Dixon. Atkins said no. The police then showed Dixon's driver's license to Atkins, who replied "I know the face, I don't know the name." Atkins also admitted that he had handled or touched a handgun within the past 12 months.

Atkins' second formal statement was taken approximately two and one-half hours later. In this statement, Atkins confessed to the robbery and the beating of Sankey, but not the murder. It was only after Sgt. Edinger told Atkins that fingerprints and handwriting on the registration card placed him at the scene that Atkins admitted that he attempted to rob the motel and did beat Sankey with the clothes iron. Atkins stated that:

> I went up to the counter. I asked for a room. He gave me the card to fill out. I started filling out the card. He glanced away. I jumped over the counter. He ran in the back room. I followed. When I went in the back room, he grabbed me and I saw this iron and I grabbed it and I hit him over the head with it. I hit him about 2, 3 times and he fell unconscious and I went back out to the lobby to try to get the cash drawer open. When it wouldn't open after several attempts, I got scared and left. That's it.

Prior to making the second formal statement, Atkins was told by the police that Sankey had been shot and killed. In his second formal statement, Atkins stated that he was "shock[ed]" when he heard this. Asked whether he shot Sankey after striking him with the iron, he replied, "No, I did not."

Atkins insisted that he acted alone, stating, "Yes, I acted alone in trying to rob the place, but I did not shoot no one." Atkins added that he drove away from the motel in a Nissan Maxima owned by a woman named "Sherri."

On April 10, 1994, two days after Atkins made his second formal statement, Dixon and his girlfriend, Cheryl Overby, were arrested while driving a Nissan Maxima. After Dixon was arrested, Atkins made his third and final formal statement. In his third statement, Atkins named Dixon as his accomplice. Prior to making his third statement, Atkins was told that Dixon had told the police that Atkins had fired the shots that killed Sankey. Atkins vehemently and repeatedly denied this, stating that "I didn't have no gun, I didn't shoot nobody." Atkins also insisted that there was no plan to shoot anyone, that he had not gone into the motel with a gun, and that he was unaware Dixon had a gun. Contrary to what Dixon told the police, Atkins claims that after beating Sankey with the clothes iron and trying unsuccessfully to open the locked cash drawer, he got "paranoid" and ran out of the motel to the car and waited for Dixon. He admitted hearing noise at some point, but did not know if a gun was being fired.

A Hennepin County Grand Jury indicted Atkins on two counts of first-degree murder: one count for premeditated first-degree murder, and one count for first-degree murder—intentional murder during the course of an aggravated robbery. Prior to trial, the state dismissed the count of premeditated first-degree murder. At trial, because Atkins exercised his constitutional right not to testify, the substance of his three statements was presented to the jury through the testimony of Sgt. Edinger. The three written formal statements were also introduced into evidence. The jury returned a guilty verdict on the remaining charge of first-degree murder—intentional murder during the course of an aggravated robbery, and the judge sentenced Atkins to life imprisonment. On direct appeal to this court, Atkins asserts that the state's evidence was insufficient to support his conviction for first-degree murder, and contends that the prosecutor violated his

right to a fair trial by committing misconduct.

## I.

Atkins first asserts that the state's evidence was insufficient to support his conviction for first-degree murder under Minn. Stat. §§ 609.185(3) and 609.05 (1994). In reviewing a sufficiency of the evidence claim, this court is limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the charged offense. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978) (citations omitted). This court does not retry the facts, but instead views the evidence in the light most favorable to the jury's verdict and assumes that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Pierson,* 530 N.W.2d 784, 787 (Minn.1995). If the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty, the verdict will not be disturbed. *Id.*

The jury found Atkins guilty of intentional murder while committing or attempting to commit aggravated robbery under Minn.Stat. § 609.185(3) and Minn.Stat. § 609.05, liability for crime by another. Minnesota Statutes section 609.185(3) provides that:

> Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life: * * * causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit * * * aggravated robbery * * *.

Minnesota Statutes section 609.05, subdivisions 1 and 2 (1994) establishes that:

> Subd. 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.
>
> Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of commit-

ting or attempting to commit the crime intended.

The purpose of Minn.Stat. § 609.05 is clear: with accomplice liability, even if two accomplices each point the finger at the other as the truly guilty one, the state may charge and prosecute both. The facts of this case illustrate a circumstance which this statute was designed to address: Atkins and Dixon each accused the other of firing the shots that killed Sankey. However, under Minn. Stat. § 609.05, regardless of who fired the fatal shots, either Atkins or Dixon could be charged and prosecuted for first-degree murder. Under Minnesota law, a defendant charged as an accomplice to first-degree murder is not required to have predicted that a companion would intentionally murder the victim. Rather, the question is whether the murder was reasonably foreseeable as a probable consequence of the intended crime. *Pierson,* 530 N.W.2d at 789; Minn.Stat. § 609.05, subd. 2. Whether the defendant could reasonably foresee that the victim would be murdered is a question of fact for the jury. *State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993). In making this determination, the jury is free to make reasonable inferences from the evidence, including inferences based on their experiences or common sense. *Id.* (citing *State v. Filippi,* 335 N.W.2d 739, 742 (Minn.1983)).

Atkins concedes that if he in fact shot Sankey, he would be guilty of the offense of first-degree murder. But Atkins claims that the state's evidence is insufficient to support his conviction under Minn.Stat. § 609.05, subd. 2 because he did not know that Dixon was carrying a weapon, and because he was waiting in the car when the shooting took place. He asserts that Sankey's murder was not a reasonably foreseeable consequence of the robbery.

Atkins argues that the facts as contained in his formal statements demonstrate that the murder was not reasonably foreseeable. In his third statement, Atkins stated that after entering the motel lobby with Dixon, he went to the counter where Sankey was working and asked for a room. When Sankey looked away, Atkins jumped over the counter

and chased Sankey into the utility room. Atkins stated that Sankey tried to grab him, at which point Atkins grabbed a clothes iron, hit Sankey over the head with it two or three times, knocking him out. Atkins then went back to the lobby to attempt to open the cash drawer. When he was unable to open the drawer, Atkins claims that he "got paranoid" and then ran out of the motel to the car to wait for Dixon. Atkins argues that if he was armed or knew Dixon was armed, it would be unreasonable for him to jump over the counter, chase Sankey and beat him with a clothes iron. Atkins also asserts that Sankey would not have run away if a gun was pointed at him. Atkins contends that due to his lack of knowledge that Dixon was armed or that Dixon planned to shoot Sankey, there was insufficient evidence for the jury to conclude that the murder was a reasonably foreseeable consequence of the robbery.

The state counters with the argument that contrary to Atkins' version of what happened, the evidence shows that in addition to the two shots that killed Sankey, a third shot was fired, which shot hit a standing metal pipe behind the counter. This evidence is crucial, for it suggests that either Atkins or Dixon shot at Sankey prior to chasing him or attacking him with the clothes iron. Based on this evidence, even if Atkins was not armed, he knew that Dixon was armed from the moment this shot was fired, which the state argues occurred as soon as the two entered the motel.

The state also highlights other evidence and testimony presented at trial which casts doubt on Atkins' assertion that either he was not armed or did not know that Dixon was armed. The jury heard testimony from Dixon's girlfriend that Atkins asked her approximately two weeks before the murder to buy .25 caliber bullets for him. The jury also heard testimony that Atkins had handled weapons in the past and had been arrested for possession of a firearm. The jury was also presented with a photograph of Atkins holding a handgun. The jury heard testimony that Dixon frequently had been seen carrying handguns, had been arrested in the past for possession of a .25 caliber handgun, and had shot himself in the thumb during a recent attempt to rob some drug dealers. The evidence relating to Atkins' and Dixon's familiarity with handguns was crucial, for as we stated in *Filippi*, "[c]ommon sense indicates that if two people plan a [robbery] they usually discuss the matter in detail beforehand, including whether or not to carry weapons." 335 N.W.2d at 742. The jury also heard testimony that Atkins and Dixon had been identified by a clerk at the Snelling Motel as the perpetrators of a previous robbery on October 5, 1993, in which a .25 caliber handgun was used. Viewing the above evidence in the light most favorable to the jury's verdict, the jury had more than sufficient evidence to conclude that Sankey's murder was a reasonably foreseeable consequence of the aggravated robbery of the Snelling Motel by Atkins and Dixon.

## II.

Atkins also argues that the prosecutor committed misconduct during closing argument by misstating the law on reasonable foreseeability and on lesser-included offenses, by arguing it would be an "unspeakable injustice" for the jury not to convict Atkins, and by arguing Atkins' character when his character was not in evidence.

We note at the outset that for each of the four alleged instances of prosecutorial misconduct, Atkins' trial counsel failed to object or to seek curative instructions from the trial judge. Nor did the judge find the alleged misconduct so improper as to require curative instructions or intervention *sua sponte*. Case law generally establishes that the failure to object to a prosecutor's statement forfeits a defendant's right to have the issue considered on appeal. *See, e.g., State v. Kline*, 306 N.W.2d 132, 133 (Minn.1981). However, this court has on occasion considered inappropriate closing arguments even when not objected to at trial. *See, e.g., State v. Post*, 512 N.W.2d 99, 103 (Minn.1994); *State v. Salitros*, 499 N.W.2d 815, 816–20 (Minn.1993).

Prosecutorial misconduct does not in and of itself require that the defendant be granted a new trial. *State v. Porter*, 526 N.W.2d 359, 365 (Minn.1995). Once misconduct has been established, the court must

then determine whether the defendant was denied a fair trial. *Id.* Generally, the defendant will not be granted a new trial if it can fairly be said that the misconduct was harmless beyond a reasonable doubt. *Id.*

■ Atkins alleges that although the prosecutor told the jury that the only question was "whether homicide is a reasonably foreseeable probable consequence of a robbery," the prosecutor committed serious error when he told the jurors that they need only decide whether "defendant or Robert Dixon caused the death" or "acted with the purpose of causing the death" of Sankey. Atkins' argument lacks merit. Although the challenged statement may be technically incorrect when read out of context, the record shows that the prosecutor commented extensively on the concept of reasonable foreseeability, making at least 20 references to the concept. The prosecutor emphasized to the jury that "this phrase here reasonably foreseeable as a probable consequence, that is the key language, the key instruction that the judge will give you in this case." The trial judge also instructed the jury on the concept of reasonable foreseeability, such that it is doubtful that the jury was so influenced by the prosecutor's remark as to render a reasonable verdict impossible. *See State v. Coleman,* 373 N.W.2d 777, 783 (Minn.1985).

■ Atkins also alleges that the prosecutor misstated the law on lesser-included offenses. This argument similarly lacks merit. In explaining the law on lesser-included offenses, the prosecutor stated that "[a] lesser-included offense arises if the jury can't *acquit* on the greater charge." (emphasis added). The prosecutor clearly misspoke—he meant "convict," not "acquit." But the prosecutor's statement, at worst, is unartful, not misconduct. A closing argument must be proper, not perfect. Unartful statements inevitably occur in the midst of a heated and impassioned closing argument, even among the best of orators. The other two alleged misstatements of the law on lesser-included offenses clearly pass muster under the test for lesser-included offenses established by this court in *State v. Leinweber,* 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). We

also find it compelling that the trial judge properly instructed the jury, and even Atkins' trial counsel cautioned the jury that the judge, not the prosecutor, is responsible for instructing the jury on the law of lesser-included offenses.

■ Atkins further alleges that the prosecutor committed misconduct in telling the jury that it would be an "unspeakable injustice" to consider the lesser-included offenses and to acquit on the charge of first-degree murder. This argument also lacks merit. By the phrase "unspeakable injustice," the prosecutor was not urging the jury to convict Atkins in order to teach him a lesson, to "send a message" to society or otherwise seek justice beyond the parameters of the case, purposes for which we have not hesitated to chastise prosecutors in the past. *See Salitros,* 499 N.W.2d at 819. Nor was the prosecutor encouraging the jury to convict based on personal fear of Atkins or those of Atkins' ilk, or to inflame the jury's passions, purposes which we have also held improper. *See, e.g., Porter,* 526 N.W.2d at 365; *Post,* 512 N.W.2d at 103. Rather, we conclude that the prosecutor was merely expressing the view that justice could only be achieved by convicting Atkins of first-degree murder, due to the overwhelming evidence establishing his guilt.

■ In reaching this conclusion, we note that prosecutors are ethically bound to "seek justice." It is therefore eminently proper for a prosecutor to beseech a jury to "seek justice" or to avoid its converse, injustice, by convicting a defendant on the charged offense, when the evidence establishes the defendant's guilt beyond a reasonable doubt. To hold otherwise would in effect punish prosecutors for beseeching the jury to do precisely what prosecutors are ethically obliged to do—"seek justice." Some may cavil with the adjective "unspeakable." While that term may be hyperbolic, it is not improper. We have never so constrained prosecutors as to require them to make a colorless closing argument, and we decline to do so here. *See State v. Jensen,* 308 Minn. 377, 380, 242 N.W.2d 109, 111 (1976).

Atkins also alleges that because he did not testify and therefore his character was not at issue, it was improper for the prosecutor to discuss his character in closing argument. Atkins focuses on two occasions where the prosecutor referred in closing argument to "his character" and twice spoke of Atkins "being a certain kind of human being" who could put a gun to a defenseless man's head.

 We find Atkins' final argument equally unpersuasive. Character attacks are improper comments during a prosecutor's closing argument. *State v. Washington,* 521 N.W.2d 35, 39 (Minn.1994); *see State v. De-Wald,* 463 N.W.2d 741, 744-45 (Minn.1990); *see also* Minn.R.Evid. 404(a) (character evidence is generally not admissible to prove action in conformity therewith). However, in this case, although the prosecutor did use the phrase "his character" in closing argument, this phrase must be read in context. The prosecutor's use of the phrase "his character" was immediately followed by references to Atkins' previous robbery conviction, his familiarity with weapons, including his arrest for possession of firearms, and his confession to beating Sankey with the clothes iron. These facts were not discussed in order to show action in conformity with Atkins' character, but to show proof of intent and knowledge pursuant to Minn.R.Evid. 404(b). Stated another way, that a prosecutor uses the term "character" in closing argument does not necessarily violate Minn.R.Evid. 404, nor necessarily give rise to a claim of prosecutorial misconduct. Rather, the term "character," like any other, must be read in the context of the entire closing argument. Atkins' attempt to frame the issue in terms of impermissible character attacks is misplaced, for the prosecutor did not argue Atkins' "character," even though he used that term.

Affirmed.