*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1820**

State of Minnesota,
Respondent,

vs.

Andrew Allen Heidemann,
Appellant.

**Filed November 14, 2016
Affirmed
Bratvold, Judge**

Rice County District Court
File No. 66-CR-15-104

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Joseph D. Van Thomme, Faribault City Attorney, Eckberg Lammers, P.C., Stillwater, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer L. Lauermann, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Peterson, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BRATVOLD**, Judge

Appellant Andrew Allen Heidemann challenges his conviction of theft, asserting

that the evidence is insufficient to support his conviction and that he was denied a fair trial

because of prosecutorial misconduct. Because the state presented evidence that appellant left a Wal-Mart without paying for a $16 package of cold sore cream, the evidence is sufficient to support the jury's verdict, and the prosecutor did not commit error during closing argument, we affirm.

**FACTS**

On December 24, 2014, Heidemann was at Wal-Mart in Faribault, Minnesota. Heidemann was in the pharmacy department where he removed a package of Abreva, a cold sore treatment, from the shelf and took it to the pharmacy register. Heidemann then purchased a prescription at the pharmacy counter, but did not pay for the Abreva. Heidemann left the pharmacy department, still holding the Abreva.

After Heidemann left the pharmacy, an asset protection employee, T.H., noticed him and started following him. T.H. testified that Heidemann walked up and down aisles, paid close attention to who was around him, randomly selected products from shelves, and did not use a cart. Based on T.H.'s training, Heidemann's behavior was suspicious.

T.H. followed Heidemann through the automotive/hardware department, stationery department, grocery department, and into apparel. T.H. saw Heidemann pick up some items in the automotive/hardware department, one of which was a black light. T.H. also saw that Heidemann still held the Abreva, which she identified by its blue egg-like shape. T.H. saw Heidemann set down the black light in the stationery department, but Heidemann still held the Abreva and two unidentified items.

In the grocery department, Heidemann picked up paper towels and then walked to the apparel department. T.H. saw Heidemann put the Abreva and two unidentified items in

2

his right pocket. Heidemann then went to register 14, where he paid for the paper towels and a soda, but not for the Abreva. In all, T.H. observed Heidemann for less than 30 minutes.

Heidemann then exited the store, setting off alarms. The store greeter, who was stationed at the doors, asked Heidemann to show his receipt. Heidemann said he left the receipt at the register, showed the greeter his bag, and continued walking out of the store. T.H. followed Heidemann into the parking lot and asked Heidemann to come to her office, Heidemann said no, got into his car, and drove away.

T.H. reviewed the surveillance video footage of Heidemann's time in the store and selected certain video clips showing Heidemann in different areas of the store. The parties stipulated to foundation for the video clips, which was marked as an exhibit and received into evidence. The video clips do not show Heidemann's entire trip to Wal-Mart. There is no video of Heidemann in the apparel department because Wal-Mart did not have a camera there; there is no video of Heidemann at register 14 because the camera in that area was broken; and there is no video of Heidemann and T.H. in the parking lot because T.H. did not select that video. The video exhibit shows Heidemann in the pharmacy department; Heidemann holding the Abreva product; Heidemann walking through different areas of the store; Heidemann setting off the alarms by the door and being approached by T.H; and Heidemann leaving the store.

T.H. called the Faribault Police Department, reported the theft to Officer Tonjum, gave him Heidemann's license plate number, and a copy of the surveillance video clips. Officer Tonjum attempted to contact Heidemann, but the telephone numbers were

3

inoperable. The state issued a complaint-warrant for Heidemann, charging him with misdemeanor theft.

During a two-day jury trial, the state offered testimony by T.H. and Officer Tonjum. During questioning, a number of inconsistencies in T.H.'s testimony were raised. T.H. testified that she saw Heidemann in the pharmacy, but later stated she was not "watching him immediately when he was at the pharmacy." Additionally, T.H. testified that she was at register 14 when Heidemann checked out, but later stated she was "maybe about 40 feet away." Also, T.H. testified that Heidemann stole Abreva and two other unidentified items from Wal-Mart, but Officer Tonjum testified that T.H. reported to him that Heidemann stole clothing. T.H. later told police that she was mistaken and Heidemann had paid for the clothing. Moreover, T.H. testified that Heidemann was wearing jeans and had "longer" hair. The surveillance footage, however, showed Heidemann was wearing cargo-type pants and had short hair. Finally, T.H. testified that she was working alone, but Officer Tonjum testified that he spoke with two asset protection employees.

During closing argument, the prosecutor stated that Heidemann "fled" and "ran" from the store. The prosecutor also argued that T.H. was not a biased witness. The jury found Heidemann guilty of theft, and this appeal follows.

**D E C I S I O N**

I. **Sufficiency of the Evidence**

Heidemann argues that there is insufficient evidence to prove that he committed theft in violation of Minnesota Statute section 609.52, subdivision 2(a)(1), which requires the state to prove beyond a reasonable doubt that he intentionally and without claim of right

4

took, used, transferred, concealed, or retained possession of another's property without their consent and with the intent of permanently depriving them of possession. Specifically, he argues that the state's case fails because: (1) T.H. is a biased witness; (2) T.H.'s testimony at trial was inconsistent; and (3) the prosecution failed to introduce corroborating evidence to prove its case beyond a reasonable doubt. We discuss each argument in turn.

This court examines the weight and sufficiency of evidence by determining whether the record supports the jury's verdict that the accused "is guilty of the offense charged." *State v. Combs*, 292 Minn. 317, 320, 195 N.W.2d 176, 178 (1972). "On review, it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence." *State v. Bliss*, 457 N.W.2d 385, 390 (Minn. 1990) (citation omitted).

## A. Bias

Heidemann argues that his conviction must be reversed because T.H. was biased. Impeachment of a witness by examination for possible bias is proper. *State v. Pride*, 528 N.W.2d 862, 865 (Minn. 1995). Even if a witness is biased, "it [is] nevertheless for the jury to determine who was telling the truth," *State v. Thorvildson*, 135 Minn. 98, 98–99, 160 N.W. 247, 247 (1916), because credibility determinations are the "exclusive function of the jury," *State v. Hadgu*, 681 N.W.2d 30, 34 (Minn. App. 2004) (quotation omitted), *review denied* (Minn. Sept. 21, 2004). On review, this court will defer to the jury's determination of credibility. *State v. Pendleton*, 706 N.W.2d 500, 511–12 (Minn. 2005).

An argument similar to Heidemann's was raised in *Thorvildson*, where appellant challenged the denial of a new trial after he was found guilty of selling "intoxicating liquors." 135 Minn. at 98, 160 N.W. at 247. At the trial, a private detective testified. *Id*.

On appeal, appellant challenged the sufficiency of the evidence, arguing the detective was biased. The supreme court affirmed, stating it could not hold "as a matter of law" that the detective's testimony lacked credence because it was his job to detect violations of liquor laws. *Id*. at 98-99, 160 N.W. at 247.

The same principle applies here. Simply because T.H. was employed by Wal-Mart as an asset protection employee to prevent shoplifting does not support reversal.  The jury heard T.H.'s testimony, as well as the evidence about her potential bias, and determined that her testimony was credible. Because credibility determinations are the "exclusive function of the jury," *Hadgu*, 681 N.W. 2d at 34, this court will defer to their judgment.

## B.    Inconsistent Testimony

Heidemann argues that, because of inconsistencies in T.H.'s testimony, the jury should have disbelieved her. "[O]n review of a criminal conviction, [this court] will construe the record most favorably to the state." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). "Even inconsistencies in the state's case will not require a reversal of the jury verdict," *id*., 295 N.W.2d at 584, because "the resolution of conflicting testimony is the exclusive function of the jury." *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn. 1984).

In essence, Heidemann asks this court to rehear his case, but that is something this court cannot do. *See State v. Bauer*, 471 N.W.2d 363, 366 (Minn. App. 1991) (stating that this court does not retry the facts and declining to do so when contradictory evidence was presented to the jury), *review denied* (Minn. July 24, 1991). The record reflects that the jury received the standard jury instruction that they are the "sole judges of whether a witness is to be believed." 10 *Minnesota Practice*, CRIMJIG 3.12 (6th ed. 2016). Because

6

the jury heard T.H.'s testimony, Heidemann's closing argument that T.H.'s testimony was inconsistent, and the jury was properly instructed regarding witness credibility, we will construe the record in the light most favorable to the conviction, and conclude that the jury resolved any conflicts in favor of the state.

### C.  Corroboration

Heidemann argues that where "additional reasons to question the [witness's] credibility" exist, the court may reverse a conviction if the state does not present corroborating evidence. *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004). Heidemann's argument misconstrues the law. "It is well-settled that a conviction can rest on the uncorroborated testimony of a single credible witness." *State v. Hill*, 285 Minn. 518, 518, 172 N.W.2d 406, 407 (1969). "As long as the evidence [is] sufficient to reasonably support the jury's finding, the credibility of a witness [is] for the jury to determine." *Foreman*, 680 N.W.2d at 539. Corroboration of a witness's testimony is required where that witness is an accomplice to the crime, Minn. Stat. § 634.031 (2014), or when accused of treason. Minn. Const. art. 1, § 9. Other crimes do not require corroboration of witness testimony.

Heidemann relies on three cases, *State v. Huss*, 506 N.W.2d 290 (Minn. 1993); *State v. Langteau*, 268 N.W.2d 76 (Minn. 1978); and *State v. Gluff*, 285 Minn. 148, 172 N.W.2d 63 (1969). However, these cases are distinguishable "because each involved additional reasons to question the victim's credibility." *Foreman*, 680 N.W.2d at 539 (affirming conviction after considering these cases). In *Huss*, a conviction was overturned because the court found the three-year-old victim's testimony to be coerced due to her exposure to

7

highly suggestive material and because her testimony otherwise lacked credibility. 506 N.W.2d at 292–93. In *Langteau*, a conviction was overturned because the record regarding the sole witness/victim was incomplete and did not explain contradictions with other established facts. 268 N.W.2d at 77. Finally, in *Gluff*, a conviction was overturned because the victim had only a short time to view the perpetrator, she admitted she was focused on the gun aimed at her, and the lineup procedures were impermissibly suggestive. 285 Minn. at 151, 172 N.W.2d at 65.

Here, "no other reasons" exist to question T.H.'s credibility. *Foreman*, 680 N.W.2d at 539. T.H. was not subjected to suggestive material, had a legitimate reason to follow Heidemann around the store, and she continuously observed Heidemann for approximately 30 minutes. Moreover, even assuming that corroboration is required, the state produced corroborating evidence in the form of the surveillance video clips. Thus, Heidemann's argument that the state must produce corroborating evidence fails.

## II.     Prosecutorial Misconduct

Heidemann argues that the prosecutor committed misconduct in his closing arguments by: (1) misrepresenting the manner in which Heidemann left Wal-Mart; (2) misrepresenting the number of people who pursued Heidemann out of the store; and (3) misrepresenting that T.H. did not have an interest in the outcome of the case. Heidemann did not object to the prosecutor's closing arguments.

When prosecutorial misconduct is not objected to, this court applies a modified plain-error test. *State v. Wren*, 738 N.W.2d 378, 389 (Minn. 2007). Under this test, the appellant must show that an error occurred and that it was plain. *State v. Ramey*, 721

8

N.W.2d 294, 302 (Minn. 2006). To be plain, an error generally "contravenes case law, a rule, or a standard of conduct" and must be clear or obvious. *Id.* If the appellant demonstrates a plain error, the burden shifts to the state to show that the error did not affect the appellant's substantial rights by showing "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). If the reviewing court determines that a plain error affected the defendant's substantial rights, it "then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*

We consider each of Heidemann's arguments for plain error. First, Heidemann argues that the prosecutor misstated evidence by saying Heidemann "fled" and "ran" from Wal-Mart because Heidemann walked out of Wal-Mart. The supreme court has held that intentionally misstating evidence constitutes misconduct. *State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006). But "closing arguments must be proper, not perfect." *State v. Atkins*, 543 N.W.2d 642, 648 (Minn. 1996)

The prosecutor's use of the word "flee" is supported by the record. T.H. asked Heidemann to talk to her, Heidemann said no, got into his car, and drove away. Black's Law Dictionary defines "flight" as "the act or an instance of fleeing, esp. to evade arrest or prosecution." 714 (9th ed. 2009). Here, the definition includes the act of evading someone, especially to avoid arrest or prosecution. Because it is fair to argue that Heidemann evaded T.H. when he left, the prosecutor did not err.

The same is true for the prosecutor's use of the term "run." T.H. testified that when she called the Faribault Police Department, she stated "that I had a shoplifter that was

9

running." After Heidemann left in his car, T.H. considered him to be running. Two definitions of "run" are applicable: "to retreat rapidly; *flee*"; and "to go when in trouble or distress." *The American Heritage College Dictionary* 1215 (4th ed. 2007). Because describing Heidemann as running is an argument that he left when in trouble, the prosecutor did not misstate the evidence and there is no error. It is also notable that during the rest of the closing argument, the prosecutor stated that Heidemann "begin[s] to leave," "gets in his car and leaves," and "left" on several occasions. *See State v. Johnson*, 616 N.W.2d 720, 728 (Minn. 2000) ("[w]ith respect to claims of prosecutorial misconduct arising out of closing argument, we consider the closing argument as a whole rather than focus on particular phrases or remarks that may be taken out of context or given undue prominence." (quotation omitted)). In summary, because describing Heidemann as fleeing or running is an argument that he left to evade prosecution or trouble, the prosecutor did not misstate evidence, and appellant has failed to show error.

Second, Heidemann asserts that the prosecutor's use of the term "they" misstated evidence, because only T.H. pursued him. In closing, the prosecutor argued, "You can very reasonably . . . assume that Wal[][m]art did not give [Heidemann] permission [to take the Abreva]. Why? Because they chased after him and he fled." But it is reasonable for the prosecutor to use the term "they" collectively, to refer to Wal-Mart. This usage may not be articulate, but arguments that are "unartful" do not necessarily rise to the level of misconduct. *Atkins*, 543 N.W.2d at 648. Further, during the rest of the closing argument, the prosecutor indicated that T.H. followed Heidemann out of the store. Because the prosecutor did not misstate evidence, there is no error.

10

Third, Heidemann argues that the prosecutor misstated evidence when he stated that T.H. was not biased. In closing argument the prosecutor stated, "I don't have an interest in the outcome of this case because I'm paid to be here. That's my job. So she's paid to be here by Walmart. That doesn't mean she has an interest in the case." The supreme court has stated that "prosecutor[s] [have] a right to analyze the evidence and vigorously argue that the state's witnesses [are] worthy of credibility." *State v. Googins*, 255 N.W.2d 805, 806 (Minn. 1977). Because it is appropriate for a prosecutor to argue witness credibility, the prosecutor's statements during closing were not error.

Because appellant failed to show plain error, we need not consider the other prongs of the modified plain-error test. After carefully considering the prosecutor's statements during closing argument, we conclude that appellant has failed to establish plain error and, therefore, there was no misconduct.

**Affirmed.**