**STATE of Minnesota, Respondent,**

v.

**Donnie Tomiji THAMES, Appellant.**

No. C0–98–1698.

Supreme Court of Minnesota.

July 15, 1999.

John M. Stuart, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., Amy Klobuchar, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Following a jury trial in Hennepin County District Court, appellant Donnie Tomiji Thames was convicted of one count of first-degree murder in violation of Minn. Stat. § 609.185(3) (1998) for the January 6, 1998 shooting death of Maurice Wells. In this direct appeal, Thames argues that the trial court erred when it allowed the state to impeach one of its key witnesses at trial with a statement she made to the police two days after the murder, and when it instructed the jury with respect to that witness' testimony. Thames also challenges the sufficiency of the evidence supporting his conviction. We affirm.

The facts giving rise to Thames' conviction are as follows. Around 9:00 p.m. on January 6, 1998, homicide investigators for the Minneapolis police department were notified that patrol officers responding to a 911 call had found a body in the parking lot behind 1909 Park Avenue in south Minneapolis. The investigators went to the address and were directed to the body of an African–American male. The body was naked except for a pair of socks, a home-monitoring bracelet on the right ankle, and a pair of gold earrings. The body was identified as that of Wells. An autopsy revealed that his death was caused by multiple gunshots fired from a semi-automatic handgun.

After identifying the body as Wells, police contacted Sommer Parker, the woman who lived with Wells. According to Parker, Wells received a call on his cell phone between 8:00 and 8:20 p.m. on January 6 from a man he arranged to meet at an apartment on Park Avenue. Before leaving for the meeting, Wells retrieved a ziplock bag containing a half-pound of marijuana. When Wells left his apartment, he was wearing a cream colored coat, a black and gray shirt, beige corduroy slacks, black boots, and black socks. He was also wearing gold earrings and a Guess watch that Parker had given him for Christmas two weeks earlier.

Parker expected Wells to return around 10:30 p.m. When Wells did not return as expected, Parker tried calling him on his cell phone between 10:30 and 11:00 p.m., and a strange male voice answered. After a short conversation in which the stranger attempted to convince Parker that he was

Wells, the man hung up. When Parker called Wells' cell phone number again, there was no answer.

A review of Wells' cell phone records revealed that a call had been placed from Wells' cell phone to the apartment of Lucia Sorrell at 10:10 p.m. on January 6. As a result, the police interviewed Sorrell on January 8. In a statement to the police, Sorrell indicated that Thames, her boyfriend, called her from a pay phone between 9:00 and 10:00 p.m. on January 6, and asked her to pick him up at a convenience store at 24th Street and Nicollet Avenue in south Minneapolis. She said that when she picked him up, Thames, who was wearing black jeans, a three-quarter length leather coat, and a blue hooded sweatshirt, said to her "I shot the guy." In addition, she told the police that Thames had her smell his hand, told her that he forced Wells to undress before killing him, and showed her a gun, as well as $200 in cash, a cell phone, and a half-pound of marijuana in a ziplock bag. After picking him up, Sorrell drove Thames to meet Jimmy Peeler and the two men drove off together in an older burgundy-colored car. Later that evening, Thames called Sorrell from a cell phone to tell her that he was staying with Jimmy Peeler and "was going to lay low." Sorrell also told the police about a three-way phone call she set up between Thames, Peeler, and an unidentified third person two days before Wells was killed. According to Sorrell, the subject of that phone call was a plan to buy marijuana from "some guy" and then rob him.

After interviewing Sorrell, the police arrested Thames for Wells' murder.[1] At the time of his arrest, Thames was driving a burgundy-colored car and wearing a Guess watch matching the description of the one Parker gave to Wells. When asked about the watch, Thames claimed that a woman he had met in Iowa named Candy gave it

to him. The police never recovered Wells' clothing or cell phone, or the murder weapon.

Three tenants of 1909 Park Avenue testified at Thames' trial. Emmanuel Woods and Tamika Mabry lived in the building with their two children. According to their testimony, Woods was asleep on the couch and Mabry was watching television when Woods was awakened by the sound of four gunshots in rapid succession. After a couple of minutes, Woods and Mabry went to the front window of their apartment, and saw a couple of people standing across the street. They also saw a man walking quickly down the driveway to the back of the apartment building. Woods testified that the man was African–American, about 5–feet–9–inches tall with a slim build, and was wearing dark clothing, including a "quarter length" coat with a hat or some type of hood. Mabry described the man as African–American, about 5–feet–7–inches tall with a medium build, wearing a leather jacket with a hood.

Another tenant, Geraldine Mark, testified that she saw two young men at the front door of the apartment building around 7:45 p.m. One man stood inside the front door, was about 5–feet–7–inches tall, and wore a jacket with a hood, and the other man, who Mark described as tall and light-skinned, stood outside the door. Mark identified Roger Peeler, who was thought to be either Jimmy Peeler's brother or nephew, as the man she saw inside the apartment building before the shots were fired. Shortly after seeing the two men, she heard four gunshots. About 20 minutes after the shots were fired, Mark looked in the hallway outside her door. She saw two black boots next to her door. By the time the police arrived and looked for the boots, they were gone.

James Patrick Quinn, Sorrell, and Parker also testified at Thames' trial. Quinn testified that he was with Thames in jail

---

1. Jimmy Peeler was also arrested but released because there was not enough evidence to charge him. Jimmy Peeler was shot and killed in April 1998 in what is believed by police investigators to be retaliation for Wells' death.

for one or two nights, and that during a conversation, Thames mentioned that he was in jail for something his girlfriend did. According to Quinn, Thames later admitted to him that he had shot Wells after luring him out of the house under the pretense of wanting to buy marijuana. Quinn also testified that Thames admitted taking a gold Guess watch, a cell phone, $200, and a half-pound of marijuana from Wells.

On the witness stand, Sorrell could no longer recall parts of the conversation she had with Thames the night of Wells' murder. According to Sorrell, her inability to recall resulted from the fact she had been drinking and smoking marijuana in early January. Sorrell also contradicted some of what she said in her January 8 statement to the police. For example, she testified that although she told the police in her statement that Thames said, "I shot the guy," she did not remember if Thames said "he" shot the guy, but she thought Thames said "they" did it and that "they" made Wells undress. Sorrell also testified that during the three-way phone call she set up two days before Wells' murder, it was Jimmy Peeler who planned to commit the robbery not Thames. In her testimony, Sorrell confirmed that Thames had her smell his hand, and that he had shown her a gun, $200, a cell phone, and a bag of marijuana the night of Wells' murder. She also testified, consistent with her statement to police, that when she picked Thames up on the night of the murder, he was wearing black jeans, a three-quarter-length black leather coat, and a blue hooded sweatshirt. Finally, she confirmed that

Thames called her to tell her that "he was going to lay low."

In her testimony, Parker identified the Guess watch Thames was wearing at the time of his arrest as the same watch she gave to Wells for Christmas. Her identification of the watch was based on her smelling the scent of Wells' cologne on the watch and recognizing scratches on the watch that were caused by Wells shortly after she gave it to him.

■ A trial court's evidentiary rulings are accorded broad discretion and will not be reversed absent a clear abuse of that discretion.[2] Under our rules of evidence, a prior inconsistent statement is not hearsay if the statement was given under oath at a trial, hearing, or other proceeding when the declarant testifies and is subject to cross-examination concerning the statement.[3] A statement not given under oath is not admissible substantively, but may be admitted under Rule 607 for impeachment purposes.[4] Under Rule 607, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." A prosecutor, however, may not misuse Rule 607 to expose the jury to hearsay under the guise of impeachment when the sole purpose in calling the witness is to introduce the witness' prior statement.[5]

■ Here, the record indicates that in calling Sorrell, the prosecutor assumed that she would testify consistent with her January statement to the police. There is no suggestion that the prosecutor knew that Sorrell was not going to testify consistent with that statement[6] or that the prosecutor was attempting to expose the jury

---

**2.** *See State v. Buggs,* 581 N.W.2d 329, 334 (Minn.1998).

**3.** *See* Minn. R. Evid. 801(d)(1)(A).

**4.** *See State v. Dexter,* 269 N.W.2d 721, 721 (Minn.1978).

**5.** *See id.; see also State v. Stofflet,* 281 N.W.2d 494, 497 (Minn.1979) (stating that "[w]hether cross-examination concerning a prior inconsistent statement is justified turns on whether

the question * * * is simply an attempt by the prosecutor to utilize innuendo").

**6.** *See State v. Anderson,* 298 N.W.2d 63, 65 (Minn.1980) (stating that the prosecutor did not misuse the rules of evidence by impeaching a state witness with a statement given to police because it "appears that the prosecutor was not sure the witness would deny defendant's guilt when she took the stand").

to hearsay under the guise of impeachment. We therefore conclude that the trial court did not abuse its discretion when it allowed the state to impeach Sorrell with her January police statement.

We next address Thames' contention that the trial court erred when it instructed the jury with respect to Sorrell's testimony. When the prosecutor began asking Sorrell about her January statement to the police, defense counsel objected. The trial court overruled the objection. Defense counsel did not seek a limiting instruction. At the close of testimony, defense counsel did request that the trial court instruct the jury by giving CRIMJIG 3.15 on prior inconsistent statements. The trial court gave the following instruction:

> You may wish and you may consider, when evaluating the believability and importance of the testimony, whether the witness has made another statement at some other time, which is inconsistent or different from the testimony that the witness tells on the stand. And if that occurred, you may use that as a consideration in deciding how believable that witness is.

After all of the jury instructions were given, the trial court asked counsel if they had any additions, exceptions, or deletions from the instructions. Defense counsel indicated that he did not.

During its deliberations, the jury asked the court which evidence of Sorrell's was admissible. In discussing what the response to that question should be with the court, defense counsel stated that the court "probably should not elaborate and answer at all. I think the court should reread the instructions on credibility of witnesses in general * * *. My first preference is to basically not answer the question." Defense counsel went on to say that if the court answered at all, it should tell the jury to "reread everything in a general way on evaluating witnesses and credibility of testimony." The trial court disagreed and gave the following supplemental instruction:

What was submitted was Lucia Sorrell's testimony. You may consider her testimony – all the questions asked and the answers given. Some of the questions concerned statements that she gave at another time, at an earlier time shortly after the commission of the crime, and you may consider questions about the statements that she made in January as evidence if she affirms the truth of those statements as much as they were brought out during her testimony.

◼ Thames now argues that this instruction confused the jury because there was no way for the jury to decipher which parts of Sorrell's testimony were substantive evidence. Analyzing the supplemental instruction in tandem with the trial court's original instruction on prior inconsistent statements, we conclude that the supplemental instruction was not confusing. The instruction on prior inconsistent statements informed the jury that it could use any of Sorrell's testimony that differed from her January statement to police as evidence bearing on her credibility, and the supplemental instruction simply told the jury that it could use Sorrell's statement to police as substantive evidence to the extent that in her testimony she affirmed the truth of specific statements brought out at trial. A thorough examination of the record reveals that Sorrell's testimony was not so intertwined or confusing that the jury could not determine which portions of her testimony were admissible as substantive evidence and which portions were admissible only for impeachment purposes. Therefore, we conclude that the trial court did not abuse its discretion when it instructed the jury with respect to Sorrell's testimony.

◼ Thames also contends that the evidence supporting his conviction was insufficient. In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testi-

mony conflicting with the result reached.[7] The verdict should be upheld if the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty of the offense charged.[8] When the conviction is based on circumstantial evidence, we accord such evidence as much weight as other kinds of evidence.[9]

 The evidence in the record supports Thames' conviction. To prove first-degree felony murder, the state had to establish beyond a reasonable doubt that Thames intentionally killed Wells while committing or attempting to commit burglary or aggravated robbery.[10] The evidence in the record, viewed in the light most favorable to the verdict, establishes that: (1) two days before the murder, Sorrell set up a three-way phone call between Thames, Jimmy Peeler, and an unidentified man in which they discussed using the pretext of buying marijuana to rob someone; (2) after the murder, Thames told Sorrell "they" did it after forcing Wells to undress, had her smell his hand, and showed her a gun, $200, a cell phone, and a ziplock bag containing a half-pound of marijuana; (3) the gun Thames showed Sorrell was not a revolver; (4) Wells' death was caused by gunshots fired from a semi-automatic handgun; (5) Sorrell drove Thames to meet Jimmy Peeler after the murder and the two men drove off together in an older burgundy colored car; (6) after Sorrell returned home from dropping Thames off, Thames called her to tell her that "he was going to lay low"; (7) on the night of the murder Thames was wearing black jeans, a black three-quarter-length leather coat, and a blue hooded sweatshirt, all of which matched the general description provided by three tenants of 1909 Park of the clothing worn by a man they saw around the time of the murder; (8) at the time of his arrest, Thames was wearing the Guess watch Parker had given Wells and was driving a burgundy colored car; and (9) in a conversation with Quinn, Thames described how he robbed and murdered Wells. Based on this evidence, we conclude that the evidence supporting Thames' conviction of first-degree felony murder was sufficient.

Affirmed.

---

**7.** *See State v. Atkins,* 543 N.W.2d 642, 646 (Minn.1996).

**8.** *See id.*

**9.** *See State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989) (citations omitted).

**10.** *See* Minn.Stat. § 609.185(3).