**STATE of Minnesota, Respondent,**

v.

**Milton K. SANDERS, Appellant.**

No. C2–98–1606.

Supreme Court of Minnesota.

July 29, 1999.

John M. Stuart, State Public Defender, Theodora Gaitas, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., St. Paul, Amy J. Klobuchar, Hennepin County Atty., Mary M. Lynch, Asst. County Atty., Minneapolis, for respondent.

## OPINION

BLATZ, Chief Justice.

Appellant, Milton K. Sanders, was convicted of one count of first-degree murder and two counts of attempted first-degree murder on May 6, 1998. The trial court imposed consecutive sentences for the three convictions. On appeal, appellant argues that: (1) the trial court abused its discretion in denying appellant's request for a continuance; (2) the jury had insufficient evidence to support the convictions; (3) the prosecutor committed misconduct during closing arguments; and (4) the trial court abused its discretion by imposing consecutive sentences for each of the three convictions. We affirm.

On October 5, 1997, appellant shot and killed 16–year–old Maurice Wilson, and shot and wounded Laverne David Roberts and Cordell Watts. The shooting occurred outside an apartment building located at 2129–2135 Emerson Avenue North in Minneapolis. The shooting followed an earlier fight between two groups of women which occurred outside the same apartment building. One of the women involved in the fight was Donetta Simpson, appellant's girlfriend.

After the fight and just before the shooting, appellant was at the apartment of Carlynnettia Sanders, appellant's aunt.

The apartment was located at 620 23 rd Avenue North, five blocks from the Emerson apartment building. Surella Jenkins was also at Carlynnettia Sanders' apartment and testified that appellant left the apartment with a shotgun covered by a black plastic garbage bag. Jenkins further testified that a second, unidentified man accompanied appellant and carried a handgun, and that both men were dressed in baggy hooded sweatshirts. Another witness at the apartment, Latresa Mitchell, asked the men what they were doing. They replied: "We're going to go handle our business." Both Jenkins and Mitchell later identified appellant from a photographic lineup.

Appellant and the second man then drove to the Emerson apartment building, where they were joined by a third accomplice. Roberts and Watts were standing outside the apartment building, and Wilson had just arrived at the building on his bicycle. Appellant and his accomplices began to fire at Roberts and Watts with the shotgun and nine-millimeter handgun. Roberts was shot in the leg and head, and Watts was shot in the hand, before they were able to run away for cover. Wilson was fatally shot in the head. At trial, the state's theory of the events was that appellant was angry with Roberts and Watts for failing to protect Simpson during the fight, while Wilson was merely an innocent bystander.

A neighbor who witnessed the incident testified that he saw two men in baggy clothes run away and drop two guns, including a shotgun wrapped in a black plastic garbage bag, in some nearby bushes. Upon their arrival at the scene, the police found a 12–gauge shotgun wrapped in a black plastic garbage bag, a nine-millimeter semiautomatic handgun, and two hooded sweatshirts in the nearby bushes. While the police were not able to find identifiable fingerprints on the shotgun and handgun, they were able to identify appellant's fingerprints on the black plastic garbage bag.

Later that evening appellant was in St. Paul at the apartment of his friend, Mike.[1] There, appellant sought a ride back to Minneapolis "because he just killed somebody and [ ] he needed to go back and finish somebody off." Appellant and Mike convinced a young woman that they knew, Staci Haider, to drive appellant back to north Minneapolis. Before they left, appellant went to Haider's apartment and used Haider's phone to call an unknown person. While appellant talked on the phone, Haider heard appellant brag that "he just killed somebody and he needed to finish somebody off." Before appellant left the apartment with Haider, Mike advised appellant to "bring the guns back." Appellant replied that the shotgun was too big to bring back, so Mike recommended that appellant "just bring the nine back, leave the shotgun up there."

Appellant and Haider then left for Minneapolis, with Haider driving and appellant sitting in the front passenger seat. As they were driving out of the apartment parking lot, Haider spotted two St. Paul police officers that she knew. Because she was scared and did not want to get involved with appellant, Haider waved to the officers to flag them down. The police stopped the car, faked an arrest of Haider, and brought her into a nearby office so she could speak with the police away from appellant. Haider told the officers that appellant had shot and killed someone in north Minneapolis, and that he was going back to kill someone else. After the officers confirmed with the Minneapolis Police Department that there had been a fatal shooting in north Minneapolis earlier that day, appellant was arrested. When arrested, appellant falsely identified himself as "Anthony Tony Maurice Love" and also gave a false date of birth.

Appellant was indicted and charged with one count of first-degree murder and two counts of attempted first-degree murder. At trial, the facts described above were presented to the jury. In addition Rob-

---

1. No last name was known or used at trial or in the record.

erts, one of the victims, testified that appellant called him several days after the shooting and said, "we was not trying to shoot you." The state also presented testimony from a deputy with the Hennepin County Sheriff's Department. The deputy was escorting appellant within a detention facility, and overheard appellant brag to another inmate that he had "shot the bitch point-blank," and that no witnesses could identify him.

Based on the above evidence, the jury convicted appellant of all three counts. The trial court sentenced appellant to life imprisonment for the first-degree murder conviction, and to consecutive 180-month sentences for the two attempted first-degree murder convictions.

## I.

■■■ We first consider appellant's argument that the trial court abused its discretion in denying appellant's third and fourth requests for a trial continuance, as appellant's second attorney had only 19 days to prepare for trial and was suffering from a temporary hearing problem. "The decision to grant a continuance is vested in the sound discretion of the trial court." *State v. Miller*, 488 N.W.2d 235, 239 (Minn.1992) (citing *State v. Lloyd*, 345 N.W.2d 240, 247 (Minn.1984)). "The trial court will not be reversed unless it has abused its discretion." *Id.* (citing *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn. 1980)). On review, we look to "the circumstances surrounding the requested continuance and whether the denial was so prejudicial in the preparation of an adequate defense as to 'materially affect the outcome of the trial.'" *Id.* (quoting *Lloyd*, 345 N.W.2d at 247).

■■■ An initial consideration in reviewing the denial of a continuance is whether the trial court had granted any previous motions for continuance by appellant. *See id.* In the present case, the trial court granted appellant's first two motions for continuance. Appellant first requested a continuance due to a death in his attorney's family. The motion for a continu-

ance was granted and trial was rescheduled from January 26, 1998, to April 13, 1998.

Appellant claims that because his second attorney lacked adequate time to prepare for trial, appellant was denied a fair trial. However, it was appellant's choice to change counsel just 12 days before the rescheduled April 13 trial date. Although appellant was initially represented by an attorney from the public defender's office, he later retained private counsel. On April 1, 1998, appellant's second attorney filed a certificate of representation. Two days later, appellant filed a second motion for continuance to allow his second attorney to prepare for trial. The criminal assigning judge granted appellant a one-week continuance and rescheduled the April 13, 1998, trial date to April 20.

On April 13, one week before trial was scheduled to begin, appellant filed a third motion for continuance. In an affidavit attached to the motion, appellant's counsel asserted that he had been previously unable to view the physical evidence held by the police, and would only have a short time to analyze the evidence before trial. Further, the affidavit described evidence and witnesses that appellant's counsel needed to investigate. In addition to requesting more time to prepare for trial, appellant's counsel also asserted that he was suffering from diminished hearing capacity. Specifically, he stated that a sinus infection prevented him from pressurizing his right ear, making it difficult to distinguish similar sounding words at low volumes. Nonetheless, the assigning judge denied appellant's motion and referred any additional consideration of motions for continuance to the trial judge.

On April 20, when trial was scheduled to begin, appellant again requested a continuance for the reasons stated above. The trial court denied appellant's request, citing as a basis for its ruling the two previous motions for continuance that were granted, and noting that the trial date had already been delayed for almost three

months, giving appellant ample time to secure trial counsel. The court also indicated that in order to address counsel's hearing problem, anyone speaking at trial would be in front of appellant's counsel. Thus, on April 20 the trial began with pretrial motions and jury selection. Opening statements were not given until April 30.

■ Appellant argues that the denial of the last two motions for continuance deprived him of a fair trial. We disagree. First, the trial court granted appellant's two previous motions for continuance, including one after appellant retained his final trial counsel. While the continuance only gave appellant's new counsel 19 days to prepare for trial, this is a factor that appellant should have considered when he changed counsel at such a late date. *See State v. Fagerstrom*, 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970). "A defendant may not demand a continuance to delay the proceedings or by arbitrarily attempting to substitute another attorney at the time of trial." *State v. Worthy*, 583 N.W.2d 270, 278 (Minn.1998) (citing *Fagerstrom*, 286 Minn. at 299, 176 N.W.2d at 264); *see also State v. Vance*, 254 N.W.2d 353, 358–59 (Minn.1977). A trial court's ability to control the timing of a trial is critical in ensuring sound judicial administration and a speedy trial for all criminal defendants. *See Fagerstrom*, 286 Minn. at 299, 176 N.W.2d at 264.

Second, appellant's counsel acknowledged that the trial court accommodated his hearing problem by using a courtroom equipped with microphones, informing the court that, "I did not have any problem with microphoned discussion or conversation in the courtroom, so if we're all miked, I think it may actually be okay." On the occasions where appellant's counsel had difficulty in hearing witnesses, the witnesses were asked to repeat their answers.

Although appellant argues that his counsel's hearing problem and lack of time to prepare for trial deprived him of a fair trial, the trial court found otherwise. In addition to accommodating counsel's hear-

ing problem, the trial court found that appellant's counsel had adequate time to investigate witnesses and examine evidence. On appeal, appellant has failed to show that the trial court abused its discretion in making these findings and denying the last two motions for continuance. As appellant made the decision to change counsel 12 days before trial was originally scheduled to begin, the court had already granted two motions for continuance, and the court accommodated appellant's counsel's hearing problem, appellant was not prejudiced or deprived of a fair trial.

II.

■ We next turn to appellant's argument that the jury had insufficient evidence to support the convictions. "When we review a claim by an appellant that the evidence was insufficient to support a conviction, we are limited to determining whether a jury could reasonably conclude that the defendant was guilty of the charged offense." *State v. Lahue*, 585 N.W.2d 785, 788 (Minn.1998) (citing *State v. Atkins*, 543 N.W.2d 642, 646 (Minn. 1996)). "We view the evidence in the light most favorable to the verdict when determining whether the jury gave due regard to the presumption of innocence and the state's burden to overcome it with proof beyond a reasonable doubt." *Id.* (citing *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995)). "When reviewing the circumstantial evidence and the inferences that may be derived from it, we recognize a jury is in the best position to evaluate the evidence." *Id.*, 585 N.W.2d at 788–89 (citing *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988)).

■ In the present case, the jury had sufficient evidence to support appellant's convictions of one count of first-degree murder and two counts of attempted first-degree murder. First, the state presented physical evidence identifying appellant's fingerprints on the black plastic garbage bag that the shotgun was wrapped in. Further, the state produced witnesses who

were with appellant at Carlynnettia Sanders' apartment before the shooting, and observed appellant preparing to commit the crime. The witnesses saw appellant leave the apartment with a shotgun covered by a black plastic garbage bag. Appellant or his accomplice stated, "We're going to go handle our business."

The state also produced witnesses who testified that appellant made self-incriminating statements on several different occasions. Haider was with appellant following the shooting and heard him brag that "he just killed somebody and he needed to finish somebody off." Roberts testified that appellant told him that appellant was not trying to shoot him. Finally, a sheriff's deputy at a detention facility overheard appellant brag to another inmate that he had "shot the bitch point-blank." Given this evidence and testimony, the jury could reasonably conclude that appellant was guilty of the charged offenses.

### III.

■ The third issue we address is appellant's argument that the prosecutor's statements during closing argument constituted misconduct warranting reversal and a new trial. Appellant claims that the prosecutor's closing argument improperly attacked appellant's character, relied on law and order arguments, and injected personal opinion regarding the credibility of appellant's witness.

■ However, while appellant claims that these statements constitute misconduct on appeal, he failed to object to the statements at trial. Typically, "the failure to object to a prosecutor's statement forfeits a defendant's right to have the issue considered on appeal." *Atkins*, 543 N.W.2d at 647; *see also State v. Gunn*, 299 N.W.2d 137, 138 (Minn.1980); *State v. Flom*, 285 N.W.2d 476, 477–78 (Minn. 1979). We may consider an appellant's claim of prosecutorial misconduct even when appellant has failed to object at trial when the error is sufficient to do so. *See State v. Ives*, 568 N.W.2d 710, 713 (Minn. 1997). However, we decline to do so in the present case as the substantial evidence against appellant ensures that the alleged misconduct was harmless beyond a reasonable doubt. *See Atkins*, 543 N.W.2d at 647–48.

■ Nonetheless, when prosecutors make statements during closing argument that raise concerns of prosecutorial misconduct, we strongly encourage defense attorneys to object to such statements at the time they are made. A timely objection enables the trial court to provide curative instructions to the jury and ensures defendants a fair trial. Importantly, an objection might deter the prosecutor from continuing on an improper line of argument.

### IV.

■ Finally, we address appellant's argument that the trial court unfairly exaggerated appellant's criminality by imposing a life sentence for the first-degree murder conviction and two consecutive 180–month sentences for the two attempted first-degree murder convictions. We "will not interfere with a trial court's discretion in sentencing unless the sentence is disproportionate to the offense." *State v. Hough*, 585 N.W.2d 393, 397 (Minn.1998) (citing *State v. Schantzen*, 308 N.W.2d 484, 487 (Minn.1981)). "A trial court's decision regarding permissive, consecutive sentences will not be disturbed unless the resulting sentence unfairly exaggerates the criminality of the defendant's conduct." *Id.* (citing *State v. Norris*, 428 N.W.2d 61, 70 (Minn.1988)). The trial court is given such deference because it "sits with a unique perspective on all stages of a case, including sentencing, and the trial judge is in the best position to evaluate the offender's conduct and weigh sentencing options." *Id.* (citing *State v. Back*, 341 N.W.2d 273, 275 (Minn.1983)).

■ In the present case, appellant shot three individuals in front of the Emerson apartment building. The three victims' wounds ranged from minor to fatal. While

the three convictions arose from a single behavioral incident, trial courts may impose separate sentences when a defendant is convicted of multiple felonies involving more than one victim. *See* Minnesota Sentencing Guidelines II.F.; *see also State v. Bookwalter,* 541 N.W.2d 290, 294 (Minn. 1995) (citing *Norris,* 428 N.W.2d at 70). Under these circumstances, the imposition of consecutive sentences did not unfairly exaggerate appellant's criminality.

Affirmed.