**STATE of Minnesota, Respondent,**

v.

**William Jeffrey McDONOUGH, Appellant.**

**No. C6–00–1626.**

Supreme Court of Minnesota.

Aug. 2, 2001.

---

Seven P. Russett, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, for appellant.

Mike Hatch, State Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, for Respondent.

## OPINION

GILBERT, Justice.

Appellant William McDonough was convicted of one count first-degree murder and one count attempted first-degree murder, and he was sentenced to life imprisonment for first-degree murder and a consecutive term of 180 months for attempted first-degree murder. On appeal, McDonough argues that he is entitled to a new trial because: (1) the district court erred by admitting statements McDonough made to a police officer after McDonough invoked his right to an attorney, (2) the district court erred by allowing the prosecutor to strike the sole African American juror, (3) the district court erred by not dismissing the indictment, (4) the state failed to preserve evidence and the district court failed to take any remedial action, (5) the district court erred by allowing a witness to testify that McDonough had a dispute with his brothers and by admitting as substantive evidence another witness's testimony that she observed McDonough with a gun two weeks before the shooting, (6) the prosecutor committed three instances of misconduct, (7) the evidence was insufficient to support the jury's verdicts, and (8) the search warrant was flawed. We affirm.

Shortly after 10:30 a.m. on June 12, 1999, Reginald Rodgers and Steven Crenshaw left the apartment Crenshaw shared with Gebriela Ansera to deliver marijuana to a friend. Rodgers and Crenshaw left in Ansera's blue Oldsmobile Cutlass Supreme. Crenshaw drove east on Iglehart and pulled into a driveway near 985 Iglehart. A white Cadillac pulled up behind Crenshaw, which prevented Crenshaw from backing out of the driveway. Crenshaw noticed that the Cadillac had a blue interior and rust above the wheel.

Crenshaw testified that the driver got out of the Cadillac and approached the vehicle Crenshaw and Rodgers occupied. Crenshaw heard Rodgers say that he thought "Leo," a/k/a McDonough, drove a white Cadillac and that the man approaching had a gun. As the man began firing at Crenshaw and Rodgers, Crenshaw accelerated his car over the boulevard, around a tree, and off the curb in an effort to escape. Both Rodgers and Crenshaw ducked down, but one of the first shots hit Rodgers. As Crenshaw attempted to escape, he drove past the man, made eye contact with him, and saw the gun in his hand. Crenshaw immediately recognized the shooter as McDonough, whom Crenshaw has known since elementary school. The last shot McDonough fired was at Crenshaw, which struck his shoulder, but he was nonetheless able to continue driving and soon reached his apartment.

When Crenshaw returned to his apartment, he quickly explained to Ansera what happened, including identifying the shooter as "Leo," and Ansera telephoned 911. The police and the paramedics arrived and determined that Rodgers was dead. The paramedics then transported Crenshaw to the hospital where he was treated for a superficial gunshot wound. Crenshaw told the officers at the hospital that a man named "Leo" shot him and Rodgers. Although Crenshaw did not indicate a possible motive, at trial he testified that McDonough was involved in a dispute with Crenshaw's brothers. The police began their investigation immediately.

The police secured Ansera's vehicle for processing while Rodgers' body was still inside it. They found a .9mm shell casing on top of a seatbelt in the rear passenger area, and they also found a bullet hole— with the bullet still in the hole—on the passenger side post between the front and rear seats. In addition, a piece of lead from a bullet was found on the driver's

side floor mat, and a bullet's copper jacket was found on the other side of the mat. There was also a bullet hole in the vehicle's windshield. After Rodgers' body was removed from Ansera's vehicle, and during a later inspection, the police found an intact spent bullet alongside the driver's door and seat and a baggie containing a substance the police believed to be marijuana. The police returned Ansera's vehicle to her 3 days later after photographing, recording, and measuring all items of interest to the investigation.

The police also investigated the scene near the driveway at 985 Iglehart where the shooting took place. The police observed skid marks that began at the driveway and proceeded over the grassy boulevard and back onto the street. They also found two .9mm shell casings.

In addition, the police located several eyewitnesses. One neighbor heard a noise just before 11:13 a.m. and looked out her window to see a midsize blue car moving slowly in an eastwardly direction being chased by a man wearing dark clothes who was firing gunshots. Another neighbor who was awakened at 11:13 a.m. by the sound of four gunshots coming from in front of his home looked out his window to see a blue car traveling south being chased by a light-skinned African–American male with a gun in his hand. That neighbor described the shooter as in his 20s, medium build with large braids, and wearing a black shirt and black pants.

One other neighbor heard screeching tires followed by four gunshots and observed a "light-skinned male with braids" dressed in black with a black glove on his right hand who was holding a gun and crouching on the boulevard looking east towards Chatsworth. She also observed the man go to a white car she described as an "older" Cadillac or Lincoln Continental with a rear tire package.

Still another neighbor who was walking home along the sidewalk saw a blue car with two African–American males traveling east on Iglehart. As he got to the edge of his driveway, he heard gunshots ahead of him and he looked up to see the same blue car that passed him earlier drive across the boulevard, around a tree, and back on to Iglehart in order to get around a white vehicle blocking its path back onto the street. The neighbor also observed a young African American male running after the blue car firing gunshots at the blue car. The neighbor then observed the shooter get into the white car and speed away, passing the neighbor as the white car drove westerly on Iglehart. The neighbor testified that he saw only one person in the white car, which he described as an early 1980's General Motors model with rust.

The police interviewed Crenshaw at Regions Hospital that same day. Crenshaw told the police officer that "Leo" shot him and Rodgers, and Crenshaw described "Leo" as an African American male with a light complexion, 23– or 24–years–old, and wearing braids on both sides of his head. Based on Crenshaw's description, the police created a computer-generated photo lineup containing McDonough and five other similar looking males on a single sheet of paper with no names underneath the photos. Crenshaw, who was the only person to see the shooter's face, identified McDonough as the shooter.

That evening, the police went to the apartment McDonough shared with Hope Green to execute a search warrant. McDonough was not there, but the police found and seized a black jacket, black pants, and a black right-handed glove. Green told police that McDonough wore those clothes earlier in the day when he left to get gas and see if he could get Green's white Cadillac fixed. Green also

told police that she thought McDonough left at about 11:00 a.m., and a mechanic at a nearby service station told police that McDonough came by with Green's car sometime after 10:30 a.m. Green also told police that McDonough returned after 10 or 15 minutes without the car, called McDonough's cousin Santo McDonough and friend Vernon Powers, who both came to the apartment, discussed something with William McDonough in a bedroom, and then the three men left at 11:54 a.m. During the search, the police accidentally disconnected Green's caller ID box erasing its memory.

The police apprehended McDonough on June 13, 1999 after conducting surveillance on McDonough's sister's Minneapolis home. He was then taken into custody and interrogated. The police also found Green's car near the garage of an apartment complex near Green's apartment. McDonough was then taken to St. Paul Police Headquarters where he told an officer that he left the apartment he shared with Green sometime after 12:00 p.m. on the day of the shooting, and that Green would verify that.

The Ramsey County Medical Examiner conducted an autopsy on Rodgers' body. The autopsy revealed entrance and exit gunshot wounds on Rodgers' right forearm and right leg that were fired from at least two feet away and could have been caused by the same bullet. In addition, a separate projectile caused a .9mm or .38mm gunshot entrance wound at the back of Rodgers' neck, and the medical examiner concluded that bullet was also fired from at least two feet away, then entered Rodgers' skull, struck his brain, and exited through Rodgers' upper forehead. The medical examiner concluded that the wound track indicated that Rodgers probably had his head down and may have been bent forward at the waist.

The Bureau of Criminal Apprehension (BCA) performed tests on the shell casings and bullet fragments found in Ansera's car and at the crime scene. The BCA determined that the shell casings were fired from one gun and the bullet fragments were fired from one gun, but the BCA could not determine whether the casings and fragments were all fired from the same gun.

McDonough was indicted on charges of first-degree murder, first-degree attempted murder, second-degree murder, and second-degree attempted murder. He pleaded not guilty. Before trial, McDonough challenged the indictment by asserting that the state failed to present exculpatory evidence to the grand jury. McDonough asserted that the grand jury was not told, among other things, that Crenshaw originally told the police that he had seen McDonough before pulling into the driveway and that Crenshaw was making a U-turn in the driveway "to go back and talk to Leo;" that Green told police that McDonough left his apartment at 11:00, returned fifteen minutes later, and left again at noon or that the shooting occurred 5.6 miles from the apartment; and that McDonough's clothes had been examined for blood and that no blood spatter had been found.

McDonough also challenged the indictment by arguing that the state presented the grand jury with misleading and potentially false testimony consisting of two statements by a police officer. The officer stated that the police uncovered no evidence that would have led to the conclusion that McDonough was at home at the time of the shooting and that there were no other possible suspects in response to the jury's question of whether there were additional suspects. The district court disagreed with McDonough's argument and

denied McDonough's motion to dismiss the indictment.

McDonough also challenged the validity of the search warrant. He asserted that the police officer who applied for the search warrant made a false statement and a material omission in her application. But the district court disagreed and determined that the search warrant was supported by probable cause.

In addition, McDonough filed a motion to suppress the statement he gave to police during a custodial interrogation that he was home until noon the day of the shooting. After McDonough invoked his right to counsel, the officer continued talking with McDonough, stating:

Officer: [W]e're continuing this investigation * * * [b]ut if you have a story to tell, ok. * * * You told the other officers you have something you wanted to tell me, ok.

* * *

McDonough: I don't know what's going on. Ok, I'll wait for my lawyer.

Officer: It's up, you know.

McDonough: I'll just wait for my lawyer. I don't even know, you know. This is just.

Officer: It's, it's up to.

McDonough: I don't understand it.

Officer: You're an adult, you can make these decisions for yourself. Ok, you're the one in control here, you're the one in charge. Ok. You talk to your lawyer, you talk to whoever it takes to help you make this decision. Ok, if you have a righteous story to tell.

* * *

McDonough: I can't seem to get a hold of the lawyer right now, so all I can do is wait.

Officer: Ok, that's up to you.

McDonough: Ok.

Officer: Whatever, you know like I said before Leo, you're, you're the one in charge here. You're the one making all the decisions.

McDonough: Uh huh (affirmative).

Officer: And if you need the lawyer to help you make that decision on what you wanna say or what you wanna tell us.

After reviewing the transcript of McDonough's interrogation, the court determined that McDonough unequivocally invoked his right to counsel, but that the officer's subsequent statements were "subtle suggestions that [McDonough] should make up his own mind about talking or not talking to her, [and] were not a coercive influence on the defendant who is intelligent, street smart, and has a prior felony experience." The court also determined that it was McDonough who reinitiated conversation with the officer, and the court denied McDonough's motion to suppress the statement.

During jury selection, the state exercised a peremptory strike against the only African–American juror. McDonough raised a *Batson*[1] challenge, but the district court allowed the strike upon finding the state's reason for striking the juror to be race neutral.

During the trial, McDonough objected to Crenshaw's testimony that at the time of the shooting Crenshaw's brothers had a dispute with McDonough, but the court determined that this testimony was admissible. McDonough also attempted to admit into evidence the 911 "incident recall log," but the court determined that the log

**1.** A *Batson* challenge is an objection to the use of a peremptory challenge based on race, as outlined in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

was inadmissible hearsay. In addition, McDonough objected to the use of Green's prior inconsistent statement to police about when she last saw McDonough with a gun, but the court admitted the statement for impeachment purposes. Finally, McDonough did not raise an evidentiary objection when the state elicited testimony regarding McDonough's criminal history.

McDonough did not testify at trial. However, several witnesses testified in an effort to establish McDonough's alibi. The apartment manager at Ansera's apartment complex testified that when Crenshaw returned after the shooting, he was frantic and hysterical and may have said "they" were shooting. A resident at the same apartment complex testified that another vehicle besides Crenshaw's returned from the shooting, and six or seven men got out of both cars, examined Rodgers' body, and appeared to congratulate each other before leaving again. Also, a woman who was with McDonough when he was apprehended testified that throughout the morning until his arrest she did not notice anything unusual about McDonough's demeanor and did not notice any evasive movements just before his arrest. Furthermore, a defense investigator testified that the driving time from the shooting scene to Hope Green's apartment where McDonough was living was approximately 11 or 12 minutes.

During closing arguments, McDonough did not object to the state's characterization of the burden of proof. In addition, McDonough did not object to the prosecutor's statement expressing her personal opinion that Green was lying, and that another witness was mistaken in her testimony.

After considering the evidence, the jury convicted McDonough on all counts, and the district court sentenced him to life imprisonment for the first-degree murder conviction and a consecutive term of 180 months imprisonment for the attempted first-degree murder conviction to be served consecutively. McDonough raises eight issues in his appeal.

## I.

We first consider McDonough's argument that the district court erred in admitting the statement McDonough made to a police officer during a custodial interrogation that he was at his apartment with Green until 12:00 p.m. Neither party disputes the district court's determination that McDonough made this statement after he unequivocally invoked his right to an attorney. Thus, we are required to begin our review with the court's determination that the statement was admissible because McDonough made the statement after he waived his right to an attorney by reinitiating conversation with the police officer. *State v. Munson*, 594 N.W.2d 128, 138–39 (Minn.1999) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).

Under the *Edwards* test, which we applied in *Munson*, if a defendant invokes his right to counsel during a custodial interrogation, but then reinitiates conversation with a police officer, and the defendant knowingly and intelligently has waived his right to counsel, any statements he makes may be admissible at trial. *Munson*, 594 N.W.2d at 140. However, if the police initiate conversation after the defendant invokes his right to counsel, any subsequent waiver is invalid and any statements that the defendant makes must be excluded. *Id.* The state has the burden of showing that the defendant's waiver and subsequent statements were not the product of words or actions that would constitute a reinitiating of the conversation by the police. *Id.* at 141.

■ In this case, the district court determined that McDonough waived his right to an attorney by reinitiating conversation with the officer and that the officer's "subtle suggestions that he should make up his own mind about talking or not talking to her, were not a coercive influence on the defendant who is intelligent, street smart, and has a prior felony experience." However, a detailed examination of McDonough's custodial interrogation indicates that it was the officer—not McDonough—who initiated further conversation. After McDonough told the officer that he wanted an attorney, the officer told McDonough that the police were "continuing this investigation * * * [b]ut if you have a story to tell, ok. * * * You told the other officers you have something you wanted to tell * * *." McDonough then reiterated his request to speak with an attorney, but the officer said, "you talk to whoever it takes to help you make this decision. Ok, if you have a righteous story to tell * * * you're the one in charge here. You're the one making all the decisions [but] if you need the lawyer to help you make that decision on what you want to say or what you wanna tell us." The officer's statements were in the nature of a warning and an inducement to talk, and the officer should have known that her statements, which were made after McDonough invoked his right to counsel, were reasonably likely to elicit an incriminating response.

■ We are troubled by the interrogating officer's apparent willingness to infringe on McDonough's right to an attorney in light of our mandate prohibiting officers from impermissibly resuming a discussion amounting to an interrogation. *Munson*, 594 N.W.2d at 140–42. Once an individual invokes the right to counsel, the police are not permitted to make statements to the individual that are reasonably likely to elicit an incriminating response. *Id.* at 141. We are also concerned by the prosecutor's decision to use this improperly elicited statement at trial and the district court's decision to admit the statement. The court's determination that McDonough knowingly waived his right to an attorney based on the court's finding of "subtle suggestions" and that McDonough "is intelligent, street smart, and has a prior felony experience" is an inappropriate basis for making this determination. We conclude that the state did not meet its burden of showing that McDonough's alleged retraction and subsequent responses were not the product of words or action on the part of the police. *Munson*, 594 N.W.2d at 143. Accordingly, McDonough's statements were admitted in error.

■ Nonetheless, a statement admitted in error is generally subject to a harmless error analysis. *Munson*, 594 N.W.2d at 143. An error is harmless beyond a reasonable doubt only if the verdict was surely unattributable to the error. *Id.* Here, McDonough never confessed, and his statement that he left his apartment at 12:00 p.m. is not direct evidence that he was the shooter—or that his actions satisfied an element of the crime for which he was convicted. In addition, McDonough had an opportunity to challenge the state's evidence and present evidence of his own, and the state did not mention this testimony during closing arguments. Although the statement was admitted in error, we determine that it was harmless error because the verdict was surely unattributable to the statements McDonough made after he invoked his right to an attorney. Therefore, McDonough is not entitled to a new trial based on this claim.

## II.

■ McDonough next argues that the district court erred when it determined

that the state articulated a race-neutral reason for striking the sole African American juror. To make a successful *Batson* challenge, the defendant must first make a prima facie showing that the state exercised a peremptory challenge on the basis of race, the burden then shifts to the state to articulate a race-neutral explanation, then the district court must determine whether the defendant met his burden of proving intentional discrimination. *State v. Martin,* 614 N.W.2d 214, 221 (Minn. 2000) (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712). When a district court considers whether the defendant met his burden, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent was inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 222 (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Furthermore, the district court's determination will not be reversed unless clearly erroneous. *Hernandez,* 500 U.S. at 369, 111 S.Ct. 1859.

■ In the instant case, we agree with both parties that the only issue on appeal is whether the district court erred when it determined that the state's reason for striking the sole African–American juror was race-neutral. The state exercised a preemptory strike against a prospective juror who expressed his belief that the outcome of a case often depends more on the lawyer's resources and that people are frequently wrongfully accused of committing crimes when they look like the person who actually committed the crime. The juror stated:

[I]f one lawyer has the best investigator behind his or her back researching, digging up, finding the facts and presenting it to you, whereas another lawyer, * * * just doesn't have the necessary resources as that, sometimes, you know,

it's pulled up and that person would get off—not get off, but get placed at the scene of the crime when they actually wasn't.

The juror also stated, "if someone is so upset and they point the finger and they pull somebody out of a lineup, if that person doesn't have an alibi, then it goes through, then it's kind of hard to get out of it."

Based on these answers, the state believed that the juror would be influenced by factors not in evidence, and the state's articulated reasons for striking the juror related solely to the specific issues McDonough asserted as his defense of misidentification and disparity of resources. Both of these themes, which were referenced by McDonough's defense attorney during closing arguments, were the precise issues to which the African American juror exhibited a bias favorable to the defense.

■ On the surface, the juror's answers provide an adequate basis for the district court to conclude that the state's articulated reason for striking the juror was race neutral; however, if the state's questions would have elicited the same responses from any fair-minded person, the state's reason for striking the juror was not race neutral. *State v. McRae,* 494 N.W.2d 252, 257 (Minn.1992). Here, the jurors were asked virtually the same questions in roughly the same order, and the only variations were in the follow-up questions. In *McRae,* the state changed its questions and asked about the general fairness of the system when it began questioning an African–American juror. *Id.* We determined that the state's articulated reason for the strike was not race neutral because the African American juror answered the state's questions in the same way that other reasonable fair-minded individuals would answer. *Id.* Because the state in this case asked the prospective

African American juror virtually the same questions as other prospective jurors who did not answer the same questions in a way that exhibited a bias favorable to the defense, the state's reason for striking the sole African American juror was race neutral. Therefore, the district court did not clearly err when it determined that McDonough did not meet his burden of proving intentional discrimination, and McDonough is not entitled to a new trial based on this claim.

### III.

McDonough next argues that he is entitled to a new trial because the district court should have dismissed the grand jury indictment as the state failed to present exculpatory evidence and misled members of the grand jury. He also argues in his supplemental pro se brief that the evidence presented to the grand jury was not sufficient to support the grand jury's finding of probable cause. A grand jury proceeding is not a trial on the merits and grand jurors do not determine guilt or innocence but rather whether there is probable cause to believe the accused has committed the crime. *State v. Inthavong,* 402 N.W.2d 799, 801 (Minn.1987). A presumption of regularity attaches to the indictment and it is a rare case where an indictment will be invalidated. *Id.* Because of this presumption, a criminal defendant bears a heavy burden when seeking to overturn an indictment. *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988). The burden is heightened when the defendant has been found guilty beyond a reasonable doubt following a fair trial. *Id.*

A prosecutor's failure to disclose exculpatory evidence to the grand jury will require dismissal of the indictment if the evidence would have materially affected the grand jury proceeding. *State v. Moore,* 438 N.W.2d 101, 105 (Minn.

1989). The effect of the undisclosed evidence on the grand jury proceeding must be judged after looking at all of the evidence that the grand jury received. *State v. Olkon,* 299 N.W.2d 89, 106 (Minn.1980). In addition, it is often proper to factor in the jury's verdict in the analysis of whether the district court erred when denying a defendant's motion to dismiss an indictment, because a petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendant was guilty as charged, but also that the defendant is in fact guilty as charged beyond a reasonable doubt. *State v. Lynch,* 590 N.W.2d 75, 79–80 (Minn. 1999) (citing *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)).

Although the grand jury was not informed of Crenshaw's statement to the police that he pulled into the driveway to make a U-turn "to go back and talk to Leo" or of Green's statement to the police that McDonough left his apartment at 11:00 and at 12:00, the grand jury knew that Crenshaw identified McDonough as the shooter. The grand jury also knew that the description Crenshaw gave police was consistent with the description several eyewitnesses provided, all the eyewitnesses consistently stated they observed a white car similar to a Cadillac or Lincoln Continental with some rust, and McDonough was driving such a car on the day of the shooting.

Even more compelling is that in a trial on the merits, in which McDonough had the opportunity to impeach witnesses and discredit the state's case with the evidence that was not disclosed to the grand jury and with evidence that McDonough believed to be false or misleading, the petit jury found McDonough guilty of first-degree murder and attempted first-degree murder. Therefore, we conclude that the

district court did not err in denying McDonough's motion to dismiss the indictment, and McDonough is not entitled to a new trial based on this claim.

## IV.

■ McDonough next argues that he is entitled to a new trial because the district court abused its discretion when it declined to impose sanctions to remedy alleged prejudice and when it determined that the state did not act in bad faith by releasing the car in which the victims were shot and by erasing a caller ID box. On these facts, to determine whether McDonough is entitled to relief based on the state's failure to preserve evidence, we consider whether the destruction was intentional and whether the exculpatory value of the lost or destroyed evidence was apparent and material. *State v. Friend,* 493 N.W.2d 540, 545 (Minn.1992).

■ Here, the police intentionally released the vehicle, but McDonough has not shown that the evidence at issue had exculpatory value. McDonough only argues that if the car was available, he could have had his own expert determine the trajectory of the bullets and location of the shooter. However, the police collected, photographed, and recorded all the relevant data from the car in which the victims were shot. McDonough had access to this information, and the bullet's trajectory and the location of the shooter were never in dispute.

■ With respect to the caller ID box, McDonough has not shown that the destruction of the information recorded was intentional. In addition, the information recorded in the caller ID box, if reliable, would not have helped McDonough's defense because it would only have established that someone called at a particular time, and not that McDonough was actually in the apartment. Accordingly, the district court did not abuse its discretion when it determined that McDonough was not entitled to relief, because he has not shown that the evidence at issue had exculpatory value. Therefore, McDonough is not entitled to a new trial based on this claim.

## V.

■ McDonough argues that he is entitled to a new trial because the district court abused its discretion (1) when it allowed Crenshaw to testify as to whether he knew if there was "any particular problem between any of [Crenshaw's] brothers and [McDonough]" on the day of the shooting because the statement lacked foundation, (2) when it admitted Green's prior inconsistent statement as substantive evidence without also providing the jury with a limiting instruction, and (3) when it refused his request to introduce a copy of the police department's "incident recall log," which summarizes the 911 call in which a caller states that she saw two men speed away from the scene in a white car. We will only overturn a district court's evidentiary ruling if that court abused its discretion. *State v. Ferguson,* 581 N.W.2d 824, 831 (Minn.1998). Even if the court abused its discretion and admitted evidence in error, a new trial is not warranted if the error is harmless beyond a reasonable doubt, *i.e.,* if the verdict is "surely unattributable" to the error. *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997).

*Lack of Foundation*

■ Despite McDonough's hearsay and lack of foundation objection, Crenshaw testified that his brothers were involved in a dispute with McDonough. Before asking Crenshaw if his brothers were involved in a dispute with McDonough, the state asked Crenshaw whether he was "close" to his brothers, and Crenshaw's affirmative an-

swer may have provided the foundation for the state's questions. However, even if the testimony was admitted in error, the error is harmless because motive is not an element of the crimes McDonough was charged. Minn.Stat. §§ 609.11; 609.17; 609.185, cl. 3; 609.19, subd. 1(2) (2000). As a result, the verdict is surely unattributable to evidence of a dispute between Crenshaw's brothers and McDonough, which would indicate a motive. Therefore, the district court did not abuse its discretion in admitting Crenshaw's statement, and McDonough is not entitled to a new trial based on this claim.

*Prior Inconsistent Statement*

■ McDonough also argues that the district court abused its discretion when it allowed the state to use as substantive evidence Green's prior inconsistent statement that she saw McDonough at the apartment with a "little black gun" two weeks before the shooting. A witness's prior inconsistent statement is admissible for impeachment purposes, but it is generally not admissible as substantive evidence. *See State v. Martin,* 614 N.W.2d 214, 224 (Minn.2000); Minn. R. Evid. 613(b). When a prior inconsistent statement is admitted for impeachment purposes, the district court is often requested to instruct the jury that the statement is not evidence and should not be considered in reaching the verdict. *See, e.g., State v. Thames,* 599 N.W.2d 122, 126 (Minn.1999).

■ McDonough's argument lacks merit. At trial, Green testified that the last time she saw McDonough with a gun was roughly 1 year before the shooting. The state asked Green if she remembered telling a police officer at the time of the shooting that the last time she saw McDonough with a gun was about two weeks before the shooting. After indicating she did not remember making that earlier

statement to the police, the state introduced her earlier statement as a prior inconsistent statement. The court did not admit Green's prior inconsistent statement as substantive evidence. Instead, the court stated "the fact that [counsel] asked [the police officers] if it was their question made their question substantive as well as the answer, * * *." The court did not state that Green's prior inconsistent statement itself was substantive evidence, only the police officers' questions and answers. In addition, in its instructions to the jury, the court stated:

> In deciding the believability and weight to be given the testimony of a witness you may consider evidence of a statement by the witness on some prior occasion that is inconsistent with present testimony. Evidence of any prior inconsistent statement should be considered only to test the believability and weight of the witness' testimony.

This instruction is consistent with the recommended jury instruction on prior inconsistent statements. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.15 (4th ed.1999); *Thames,* 599 N.W.2d at 126. Accordingly, the district court did not abuse its discretion because the court did not admit the prior inconsistent statement as substantive evidence. The statement was admitted for impeachment purposes, and the court instructed the jury on prior inconsistent statements. Therefore, McDonough is not entitled to a new trial based on this claim.

*Hearsay*

■ Finally, McDonough asserts that the district court erred in refusing his request to introduce a copy of the police department's "incident recall log," which summarizes the 911 call placed approximately 45 minutes after the shooting in

which an unidentified caller states that two men sped away from the scene in a white car. A district court must follow a two-step inquiry to determine whether a hearsay statement may be admitted. *State v. King*, 622 N.W.2d 800, 807 (Minn.2001) (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). The necessity of the hearsay statement must first be established by showing the unavailability of the declarant. *Roberts*, 448 U.S. at 65, 100 S.Ct. 2531. If unavailability is proved, the statement must also bear adequate "indicia of reliability" for it to be admissible. *Id.*

▮ Here, an anonymous caller placed the 911 call that was erased. The caller has not been identified, and the statement contains no indicia of reliability. The call contained information contrary to the testimony provided by every eyewitness who testified at trial that they saw one man— not two—in the vehicle, before and after as it sped away. Accordingly, the district court did not abuse its discretion in refusing to admit this hearsay evidence, and McDonough is not entitled to a new trial.

## VI.

▮ McDonough argues that even in the absence of an objection, he is entitled to a new trial because the prosecutor committed misconduct when she elicited testimony inferring that McDonough had a prior criminal record, when she allegedly misstated the burden of proof in her closing argument, and when she expressed her personal opinion that Green and an eyewitness were lying. When a defendant fails to object to a prosecutor's statement, the defendant typically forfeits his right to have the issue considered on appeal. *State v. Sanders*, 598 N.W.2d 650, 656 (Minn. 1999). If the prosecutor's comments are sufficient to do so, we can reverse a conviction even when the defendant failed to object. *State v. Johnson*, 616 N.W.2d 720, 728 (Minn.2000). However, we may decline to consider an appellant's prosecutorial misconduct claim when there is substantial evidence against him ensuring that the alleged misconduct was harmless beyond a reasonable doubt. *Sanders*, 598 N.W.2d at 656. Here, McDonough did not object to the prosecutor's statements. Accordingly, we decline to address his prosecutorial misconduct claims because of the substantial evidence against him, and McDonough is not entitled to a, new trial based on this claim.[2]

## VII.

▮ McDonough also argues in his supplemental pro se brief that the evidence presented at trial was not sufficient to support the jury's guilty verdicts. In reviewing a jury verdict for sufficiency of the evidence, we view the evidence and any reasonable inference to be drawn from that evidence in the light most favorable to the verdict. *State v. Ferguson*, 581 N.W.2d 824, 836 (Minn.1998). Our focus on review is "whether the jury, acting with due regard for the presumption of inno-

---

2. Even if we were to consider his prosecutorial misconduct claims, we would nonetheless conclude that the alleged misconduct was harmless beyond a reasonable doubt. Although the prosecutor elicited testimony inferring that McDonough had a prior criminal record, this type of testimony does not always require a new trial. *State v. Henriksen*, 522 N.W.2d 928, 930 (Minn.1994). In addition, a prosecutor's attempts to shift the burden of proof are often nonprejudicial and harmless where, as here, the district court clearly and thoroughly instructed the jury regarding the burden of proof. *State v. Buggs*, 581 N.W.2d 329, 341–42 (Minn.1998). Finally, the prosecutor's opinion regarding the credibility of the defendant's witness is often harmless if there is substantial evidence against defendant. *Sanders*, 598 N.W.2d at 656.

cence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the] defendant was proven guilty of the crime charged." *State v. Clark*, 296 N.W.2d 359, 371 (Minn.1980). We also assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988).

In the present case, the jury had sufficient evidence to support McDonough's convictions of first-degree murder and attempted first-degree murder. Viewing the evidence in the light most favorable to the verdict, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that McDonough was the murderer. Crenshaw identified McDonough as the shooter, and Crenshaw's description of McDonough was consistent with the description given by the eyewitnesses who testified at trial. Crenshaw indicated that McDonough was alone, and the eyewitnesses who testified at trial also indicated that they saw only one shooter. In addition, physical evidence and expert testimony support the guilty verdicts.

Although McDonough asserted an alibi, the standard for overturning a jury verdict is high, and the possibility of innocence does not require reversal of a jury verdict so long as the evidence as a whole makes the defendant's theory seem unreasonable. *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995). McDonough's alibi was that he left his apartment at 11:00 a.m. and returned 15 minutes later and that he then stayed in his apartment until just before 12:00 p.m. the day of the shooting. McDonough's alibi witness indicated that she saw McDonough leave at about 11:00 a.m. and return 15 minutes later; however, the alibi witness' testimony was discredited and contradicted by a significant amount of other evidence. Given this evidence and

testimony, the jury could conclude that McDonough was guilty of the charged offenses. Therefore, the evidence was sufficient to support the jury's verdicts, and McDonough is not entitled to a reversal based on this claim.

## VIII.

McDonough argues in his supplemental pro se brief that he is entitled to a new trial because the police officer applying for the search warrant made a false statement and a material omission in her application, but he does not identify the false statement or material omission—aside from asserting that the police knew that he could not have committed the crime. McDonough challenged the search warrant at trial, but the district court applied *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and determined that McDonough failed to show that the officer made a reckless or deliberate material omission in her affidavit and search warrant application. The court also determined that even if the officer had made such an omission, which would have satisfied the first part of the *Franks* test, the search warrant and affidavit were nonetheless supported by probable cause. We will not disturb the district court's findings unless they are clearly erroneous. *State v. Randa*, 342 N.W.2d 341, 343 (Minn.1984).

Under the *Franks* test, a defendant challenging a search warrant must show that the officer deliberately made a statement that was false or in reckless disregard of the truth, and that the statement was material to the probable cause determination. *State v. Moore*, 438 N.W.2d 101, 105 (Minn.1989). In the instant case, the district court found that the time factor presented by McDonough was "not a material factor" because the investigators received only "vague statements of

time from the witnesses interviewed * * * ." As a result, McDonough has not shown that the officer's statement was false or constituted a material omission. Accordingly, the district court's determination that McDonough failed to show that the officer made a reckless or deliberate material omission in her affidavit and search warrant application was not clearly erroneous, and McDonough is not entitled to a new trial based on this claim.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. I agree generally with the court's analysis and resolution of all of the issues raised by McDonough except one. With regard to that one, I agree that McDonough unequivocally invoked his Sixth Amendment right to counsel. The transcript of the interrogation indicates that he did so at least 10 times. I also agree that the district court's failure to suppress the statements McDonough made after he unequivocally invoked his right to counsel was error. However, I disagree with the court's resolution of this issue. Because Officer Wuorinen's conduct constituted such a blatant disregard for McDonough's constitutional rights, I would exercise this court's supervisory authority and remand for a new trial. *See* *State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993).